## PARKER v. NORTH CAROLINA

No. 268. Argued November 17, 1969—Decided May 4, 1970

*Norman B. Smith* argued the cause for petitioner. With him on the brief was *Larry B. Sitton.*

*Jacob L. Safron* argued the cause for respondent. With him on the brief were *Robert Morgan,* Attorney General of North Carolina, and *Andrew A. Vanore, Jr.*

*Jack Greenberg, James M. Nabrit III, Michael Meltsner, Norman C. Amaker, Charles Stephen Ralston,* and *Anthony G. Amsterdam* filed a brief for Albert Bobby Childs et al. as *amici curiae.*

MR. JUSTICE WHITE delivered the opinion of the Court.

At about 11 p. m. on July 16, 1964, petitioner was arrested after entering the yard of a home where a burglary and rape had been committed four days earlier. Petitioner, a Negro boy then 15 years old, was taken to the police station and was questioned for one or two hours. After the questioning, petitioner was placed alone in a dimly lit cell for the remainder of the night. Although petitioner refused to give even his name during the questioning, the police eventually determined his identity and notified petitioner's mother the next day between 3:30 and 4:30 a. m. That morning, petitioner was given drinking water and was then questioned by the police; petitioner almost immediately confessed to the burglary and rape committed several days earlier at the house where he had been arrested. Shortly there-

after, an attorney retained by petitioner's mother came to the police station and talked with petitioner. Petitioner told the attorney that the confession had not been prompted by threats or promises and that he had not been frightened when he made the statement to the police.

Petitioner was indicted for first-degree burglary, an offense punishable by death under North Carolina law.[1] Petitioner's retained attorney discussed with petitioner and his mother the nature and seriousness of the charge. In due course, petitioner and his mother signed written statements authorizing the entry of a plea of guilty. Both petitioner and his mother were aware at the time they signed the authorization for the guilty plea that, if the plea was accepted, petitioner would receive the mandatory sentence of life imprisonment.[2] The prose-

---

[1] In North Carolina the crime of first-degree burglary is defined as follows:

"There shall be two degrees in the crime of burglary as defined at the common law. If the crime be committed in a dwelling house, or in a room used as a sleeping apartment in any building, and any person is in the actual occupation of any part of said dwelling house or sleeping apartment at the time of the commission of such crime, it shall be burglary in the first degree." N. C. Gen. Stat. § 14–51 (1969 Repl. vol.).

The punishment for first-degree burglary is death unless the jury recommends that the penalty be life imprisonment:

"Any person convicted, according to due course of law, of the crime of burglary in the first degree shall suffer death: Provided, if the jury when rendering its verdict in open court shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." N. C. Gen. Stat. § 14–52 (1969 Repl. vol.).

[2] At the time petitioner's plea was entered, North Carolina law provided that if a plea of guilty to first-degree burglary was accepted the punishment would be life imprisonment rather than death:

"(a) Any person, when charged in a bill of indictment with the felony of murder in the first degree, or burglary in the first degree,

cutor and the trial judge accepted the plea. In accepting the plea on August 18, 1964, the trial court asked the petitioner if the plea was made in response to any promise or threat and petitioner answered in the negative; petitioner affirmed that he tendered the plea "freely without any fear or compulsion." [3] Upon acceptance of the plea, petitioner was sentenced to life imprisonment.

In 1967, petitioner, assisted by counsel, filed a petition under the North Carolina Post-Conviction Hearing Act [4] to obtain relief from his conviction. In his petition, Parker urged that his plea of guilty was the product of a coerced confession and that the indictment to which

---

or arson, or rape, when represented by counsel, whether employed by the defendant or appointed by the court . . . , may, after arraignment, tender in writing, signed by such person and his counsel, a plea of guilty of such crime; and the State, with the approval of the court, may accept such plea. Upon rejection of such plea, the trial shall be upon the defendant's plea of not guilty, and such tender shall have no legal significance whatever.

"(b) In the event such plea is accepted, the tender and acceptance thereof shall have the effect of a jury verdict of guilty of the crime charged with recommendation by the jury in open court that the punishment shall be imprisonment for life in the State's prison; and thereupon, the court shall pronounce judgment that the defendant be imprisoned for life in the State's prison." N. C. Gen. Stat. § 15-162.1 (1965 Repl. vol.), repealed, effective March 25, 1969, N. C. Laws 1969, c. 117.

[3] The Court: "Has anybody made you any promise or forced you in any way to make this plea?"

Petitioner: "No, sir."

.     .     .     .     .

The Court: "Did you sign this plea freely without any fear or compulsion?"

Petitioner: "Yes, sir."

The Court: "Has any person promised you anything if you do this?"

Petitioner: "No, sir." App. 46.

[4] N. C. Gen. Stat. §§ 15-217 to 15-222 (Supp. 1969).

he pleaded was invalid because members of his race had been systematically excluded from the grand jury which returned the indictment. After a hearing, the Superior Court of Halifax County found that there was no deliberate exclusion of Negroes from the grand jury that indicted petitioner and that petitioner had freely admitted his guilt and had pleaded guilty "freely, voluntarily, without threat, coercion or duress . . . ." The Court of Appeals of North Carolina, the highest state court in which petitioner could seek review,[5] affirmed the conviction after reviewing not only the claims presented to the lower court but also the additional assertion by petitioner that his guilty plea was involuntary because North Carolina statutes at that time allowed a defendant to escape the possibility of a death penalty on a capital charge by pleading guilty to that charge. 2 N. C. App. 27, 162 S. E. 2d 526 (1968). We granted certiorari, 395 U. S. 974 (1969), to consider petitioner's federal constitutional claims. For the reasons presented below, we affirm.

I

Parker would have us hold his guilty plea involuntary and therefore invalid for two reasons: first, because it was induced by a North Carolina statute providing a maximum penalty in the event of a plea of guilty lower than the penalty authorized after a verdict of guilty by a jury; and, second, because the plea was the product of a coerced confession given to the police shortly after petitioner was arrested. Neither reason is sufficient to warrant setting aside Parker's plea.

It may be that under *United States* v. *Jackson*, 390 U. S. 570 (1968), it was unconstitutional to impose the death penalty under the statutory framework which ex-

---

[5] N. C. Gen. Stat. § 7A–28 (1969 Repl. vol.).

isted in North Carolina at the time of Parker's plea.[6]
Even so, we determined in *Brady* v. *United States, ante,*
p. 742, that an otherwise valid plea is not involuntary
because induced by the defendant's desire to limit the
possible maximum penalty to less than that authorized
if there is a jury trial. In this respect we see nothing
to distinguish Parker's case from Brady's.

Nor can we accept the claim that the plea was infirm
because it was the product of a coerced confession. Ac-
cording to Parker's testimony at the post-conviction
hearing, he was denied food and water, promised unspeci-
fied help if he confessed, and denied counsel's advice
when he requested it. In the record, however, was an
abundance of evidence contradicting Parker's claim of
coercion: Parker's statements to his attorney soon after
his interrogation that there had been no threats or prom-
ises and that he had not been afraid, his similar declara-
tions in his sworn statement authorizing his plea,[7] his
answers to the trial judge at the time the plea was
accepted,[8] and his failure to complain of any mistreat-
ment by the police until many months after he began
serving his sentence. The North Carolina courts ac-
cordingly refused to credit his testimony and concluded
that his confession was a free and voluntary act.

---

[6] The statute authorizing guilty pleas to capital charges was
repealed, effective March 25, 1969. See n. 2, *supra.* As a result
of the repeal, a person who is charged with a capital offense and
who is not allowed to plead to a lesser charge must apparently face
a jury trial and a death penalty upon a verdict of guilty unless the
jury recommends life imprisonment.

[7] In his affidavit authorizing the entry of a plea of guilty Parker
stated that: "I have not been threatened or abused in any manner
by any person and no promises have been made to me if I plead
guilty to any charge."

[8] See n. 3, *supra.*

We would in any event be reluctant to question the judgment of the state courts in this respect; but we need not evaluate the voluntariness of petitioner's confession since even if the confession should have been found involuntary, we cannot believe that the alleged conduct of the police during the interrogation period was of such a nature or had such enduring effect as to make involuntary a plea of guilty entered over a month later. Parker soon had food and water, the lack of counsel was immediately remedied, and there was ample opportunity to consider the significance of the alleged promises. After the allegedly coercive interrogation, there were no threats, misrepresentations, promises, or other improper acts by the State. Parker had the advice of retained counsel and of his family for the month before he pleaded. The connection, if any, between Parker's confession and his plea of guilty had "become so attenuated as to dissipate the taint." *Nardone* v. *United States,* 308 U. S. 338, 341 (1939); *Wong Sun* v. *United States,* 371 U. S. 471, 491 (1963). As far as this record reveals, the guilty plea was Parker's free and voluntary act, the product of his own choice, just as he affirmed it was when the plea was entered in open court.

## II

On the assumption that Parker's confession was inadmissible, there remains the question whether his plea, even if voluntary, was unintelligently made because his counsel mistakenly thought his confession was admissible. As we understand it, Parker's position necessarily implies that his decision to plead rested on the strength of the case against him: absent the confession, his chances of acquittal were good and he would have chosen to stand trial; but given the confession, the evidence was too strong and it was to his advantage to plead guilty and

limit the possible penalty to life imprisonment.[9] On this assumption, had Parker and his counsel thought the confession inadmissible, there would have been a plea of not guilty and a trial to a jury. But counsel apparently deemed the confession admissible and his advice to plead guilty was followed by his client. Parker now considers his confession involuntary and inadmissible. The import of this claim is that he suffered from bad advice and that had he been correctly counseled he would have gone to trial rather than enter a guilty plea. He suggests that he is entitled to plead again, a suggestion that we reject.

For the reasons set out in *McMann* v. *Richardson, ante,* p. 759, even if Parker's counsel was wrong in his assessment of Parker's confession, it does not follow that his error was sufficient to render the plea unintelligent and entitle Parker to disavow his admission in open court that he committed the offense with which he was charged.[10] Based on the facts of record relating to Parker's confession and guilty plea, which we have previously detailed, we think the advice he received was well within the range of competence required of attorneys

---

[9] The North Carolina Court of Appeals noted that the prosecution may have had strong evidence against Parker in addition to the confession and that if other strong evidence existed the guilty plea could not be viewed as the product of the confession. 2 N. C. App. 27, 32, 162 S. E. 2d 526, 529 (1968).

[10] We find nothing in the record raising any doubts about the integrity of petitioner's admission. The following appears in the findings entered after the post-conviction hearing in the state trial court:

"[S]aid petitioner defendant freely admitted to his attorney his guilt of the crime with which he was charged, in fact said petitioner defendant Charles Lee Parker, upon cross examination at this hearing, and the Court so finds as a fact, has freely admitted his guilt of the capital offense of burglary and rape . . . ."

representing defendants in criminal cases. Parker's plea of guilty was an intelligent plea not open to attack on the grounds that counsel misjudged the admissibility of Parker's confession.

## III

We also have before us the question whether the indictment to which Parker pleaded is invalid because members of his race were allegedly systematically excluded from the grand jury that returned the indictment. The North Carolina Court of Appeals refused to consider the claim since under North Carolina law an objection to the composition of the grand jury must be raised by motion to quash the indictment prior to the entry of the guilty plea.[11] Because Parker had failed to raise his objection in timely fashion, relief was unavailable. This state rule of practice would constitute an adequate state ground precluding our reaching the grand jury issue if this case were here on direct review. See *Fay* v. *Noia*, 372 U. S. 391, 428–429 (1963). We are under similar constraint when asked to review a state court decision holding that the same rule of practice requires denial of collateral relief. *Ibid.* Whether the question of racial exclusion in the selection of the grand jury is open in a federal habeas corpus action we need not decide. Compare *United States ex rel. Goldsby* v.

---

[11] "All exceptions to grand jurors on account of their disqualifications shall be taken before the petit jury is sworn and impaneled to try the issue, by motion to quash the indictment, and if not taken at that time shall be deemed to be waived. . . ." N. C. Gen. Stat. § 9–23 (1969 Repl. vol.).

See *State* v. *Rorie*, 258 N. C. 162, 128 S. E. 2d 229 (1962). Under North Carolina law, a guilty plea does not waive objections to racial exclusion in the selection of the grand jury if, before the plea of guilty, the defendant raises his objection in a motion to quash the indictment. *State* v. *Covington*, 258 N. C. 501, 128 S. E. 2d 827 (1963).

*Harpole,* 263 F. 2d 71 (C. A. 5th Cir.), cert. denied, 361 U. S. 838 and 850 (1959), with *Labat* v. *Bennett,* 365 F. 2d 698 (C. A. 5th Cir. 1966), cert. denied, 386 U. S. 991 (1967). See also *McNeil* v. *North Carolina,* 368 F. 2d 313 (C. A. 4th Cir. 1966).

The North Carolina Court of Appeals correctly concluded that petitioner's plea of guilty was intelligent and voluntary, and there was an adequate basis in North Carolina procedural law for the North Carolina Court of Appeals' refusal to consider the claim of racial exclusion in the composition of the grand jury that indicted petitioner.

*Affirmed.*

MR. JUSTICE BLACK, concurring.

I concur in the judgment of affirmance and also concur in the opinion except that part on pp. 794–795 stating, "It may be that under *United States* v. *Jackson,* 390 U. S. 570 (1968), it was unconstitutional to impose the death penalty under the statutory framework which existed in North Carolina at the time of Parker's plea."

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting in No. 268, and concurring in the result in No. 270, *ante,* p. 742.

In *United States* v. *Jackson,* 390 U. S. 570 (1968), we held that the operative effect of the capital punishment provisions of the Federal Kidnaping Act was unconstitutionally "to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial." 390 U. S., at 581. The petitioners in these cases claim that they were the victims of the very vices we condemned in *Jackson.* Yet the Court paradoxically holds that each of the petitioners must be denied relief even

if his allegations are substantiated.[1]   Indeed, the Court
apparently holds that never, except perhaps in highly
unrealistic hypothetical situations, will the constitutional
defects identified in *Jackson* vitiate a guilty plea.[2]   In so
holding, the Court seriously undermines the rational
underpinnings of *Jackson* and departs broadly from our
prior approach to the determination of the voluntariness
of guilty pleas and also confessions.   This is merely one
manifestation of a design to insulate all guilty pleas from
subsequent attack no matter what influences induced
them.   I cannot acquiesce in this wholesale retreat from
the sound principles to which we have previously
adhered.

# I

The Court properly notes the grave consequences for
a defendant that attach to his plea of guilty; for the

---

[1] The present discussion, while containing occasional references to
the Federal Kidnaping Act, is equally applicable to *Parker*, for,
as I shall demonstrate in Part II of this opinion, there is no pertinent
distinction between the Kidnaping Act and the North Carolina
statutes under which Parker was convicted.

[2] The precise contours of the Court's theory, developed principally
in *Brady* v. *United States*, are unclear.   The Court initially states
that "the possibility of a heavier sentence following a guilty verdict
after a trial" is one of the "relevant circumstances" to be taken into
account in determining the voluntariness of the guilty plea.   *Ante,*
at 749.   Subsequently, however, after discussing its notion of volun-
tariness, the Court concludes that "a plea of guilty is not invalid
merely because entered to avoid the possibility of a death penalty."
*Ante,* at 755.   Elsewhere the Court states that "there [is no]
evidence that Brady was so gripped by fear of the death penalty
or hope of leniency that he did not or could not, with the help of
counsel, rationally weigh the advantages of going to trial against
the advantages of pleading guilty."   *Ante,* at 750.   If the latter
is what the Court deems to be the criterion of voluntariness, the
holding is totally without precedent, for it has never been thought
that an individual's mental state must border on temporary
insanity before his confession or guilty plea can be found
"involuntary."

plea constitutes a simultaneous surrender of numerous constitutional rights, including the privilege against compulsory self-incrimination and the right to a trial by jury, with all of its attendant safeguards. *McCarthy* v. *United States*, 394 U. S. 459, 466 (1969); *Boykin* v. *Alabama*, 395 U. S. 238, 242–244 (1969). Indeed, we have pointed out that a guilty plea is more serious than a confession because it is tantamount to a conviction. *Kercheval* v. *United States*, 274 U. S. 220, 223 (1927). Accordingly, we have insisted that a guilty plea, like any surrender of fundamental constitutional rights, reflect the unfettered choice of the defendant. See *Boykin* v. *Alabama, supra; Machibroda* v. *United States*, 368 U. S. 487, 493 (1962). In deciding whether any illicit pressures have been brought to bear on a defendant to induce a guilty plea, courts have traditionally inquired whether it was made "voluntarily" and "intelligently" with full understanding and appreciation of the consequences.

The concept of "voluntariness" contains an ambiguous element, accentuated by the Court's opinions in these cases, because the concept has been employed to analyze a variety of pressures to surrender constitutional rights, which are not all equally coercive or obvious in their coercive effect. In some cases where an "involuntary" surrender has been found, the physical or psychological tactics employed exerted so great an influence upon the accused that it could accurately be said that his will was literally overborne or completely dominated by his interrogators, who rendered him incapable of rationally weighing the legal alternatives open to him.[3]

There is some intimation in the Court's opinions in the instant cases that, at least with respect to guilty

---

[3] See, *e. g., Pennsylvania ex rel. Herman* v. *Claudy*, 350 U. S. 116 (1956); *Chambers* v. *Florida*, 309 U. S. 227 (1940); *Brown* v. *Mississippi*, 297 U. S. 278 (1936).

pleas, "involuntariness" covers *only* the narrow class of cases in which the defendant's will has been literally overborne. At other points, however, the Court apparently recognizes that the term "involuntary" has traditionally been applied to situations in which an individual, while perfectly capable of rational choice, has been confronted with factors that the government may not constitutionally inject into the decision-making process. For example, in *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), we held a surrender of the self-incrimination privilege to be involuntary when an individual was presented by the government with the possibility of discharge from his employment if he invoked the privilege. So, also, it has long been held that certain promises of leniency or threats of harsh treatment by the trial judge or the prosecutor unfairly burden or intrude upon the defendant's decision-making process. Even though the defendant is not necessarily rendered incapable of rational choice, his guilty plea nonetheless may be invalid.[4]

Thus the legal concept of "involuntariness" has not been narrowly confined but refers to a surrender of constitutional rights influenced by considerations that the government cannot properly introduce. The critical question that divides the Court is what constitutes an impermissible factor, or, more narrowly in the context of these cases, whether the threat of the imposition of an unconstitutional death penalty is such a factor.[5]

---

[4] See, *e. g., Machibroda* v. *United States,* 368 U. S. 487 (1962); cases cited, n. 7, *infra.*

[5] A further latent ambiguity in the concept of "voluntariness" arises from the notion that a plea is involuntary only if it is the product of coercion directly applied to the accused at the time his plea is entered, and hence that a plea cannot be tainted by prior unconstitutional action on the part of the government. With this view I am in disagreement for reasons more fully set forth in my dissenting opinion in *McMann* v. *Richardson, ante,* p. 775, decided this day.

Even after the various meanings of "involuntary" have been identified, application of voluntariness criteria in particular circumstances remains an elusory process because it entails judicial evaluation of the effect of particular external stimuli upon the state of mind of the accused. See *Haley* v. *Ohio,* 332 U. S. 596, 603 (1948) (separate opinion of Frankfurter, J.). Nevertheless, we have consistently taken great pains to insulate the accused from the more obvious and oppressive forms of physical coercion. Beyond this, in the analogous area of coerced confessions, for example, it has long been recognized that various psychological devices, some of a very subtle and sophisticated nature, may be employed to induce statements. Such influences have been condemned by this Court.[6] Thus, a confession is not voluntary merely because it is the "product of a sentient choice," if it does not reflect a free exercise of the defendant's will. *Id.,* at 606. Indeed, as the Court recognizes, we held in an early case that the concept of "voluntariness" requires that a confession "not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram* v. *United States,* 168 U. S. 532, 542–543 (1897). More recently, we held in *Malloy* v. *Hogan,* 378 U. S. 1 (1964), that the Fifth and Fourteenth Amendments guarantee to every person the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 U. S., at 8. Cf. *Garrity* v. *New Jersey,* 385 U. S. 493 (1967).

The Court's answer to the stringent criterion of voluntariness imposed by *Bram* and subsequent cases is

---

[6] See, *e. g., Miranda* v. *Arizona,* 384 U. S. 436 (1966); *Haynes* v. *Washington,* 373 U. S. 503 (1963); *Rogers* v. *Richmond,* 365 U. S. 534 (1961); *Spano* v. *New York,* 360 U. S. 315 (1959); *Haley* v. *Ohio,* 332 U. S. 596 (1948).

that the availability of counsel to an accused effectively offsets the illicit influence upon him that threats or promises by the government may impose. Of course, the presence of counsel is a factor to be taken into account in any overall evaluation of the voluntariness of a confession or a guilty plea. However, it hardly follows that the support provided by counsel is sufficient by itself to insulate the accused from the effect of any threat or promise by the government.

It has frequently been held, for example, that a guilty plea induced by threats or promises by the trial judge is invalid because of the risk that the trial judge's impartiality will be compromised and because of the inherently unequal bargaining power of the judge and the accused.[7] The assistance of counsel in this situation, of course, may improve a defendant's bargaining *ability,* but it does not alter the underlying inequality of *power.* Significantly, the Court explicitly refrains from expressing its views on this issue. (*Ante,* at 751 n. 8.) This is an unfortunate omission, for judicial promises of leniency in return for a guilty plea provide a useful analogy to what has occurred in the instant cases. Here, the government has promised the accused, through the legislature, that he will receive a substantially reduced sentence if he pleads guilty. In fact, the legislature has simultaneously threatened the accused with the ultimate penalty—death—if he insists

---

[7] See, *e. g., Scott* v. *United States,* 135 U. S. App. D. C. 377, 419 F. 2d 264 (1969); *United States ex rel. McGrath* v. *LaVallee,* 319 F. 2d 308 (C. A. 2d Cir. 1963); *Euziere* v. *United States,* 249 F. 2d 293 (C. A. 10th Cir. 1957); *United States ex rel. Elksnis* v. *Gilligan,* 256 F. Supp. 244 (D. C. S. D. N. Y. 1966); *United States* v. *Tateo,* 214 F. Supp. 560 (D. C. S. D. N. Y. 1963); *Commonwealth* v. *Evans,* 434 Pa. 52, 252 A. 2d 689 (1969). See generally Recent Developments, Judicial Plea Bargaining, 19 Stan. L. Rev. 1082 (1967).

upon a jury trial and has promised a penalty no greater than life imprisonment if he pleads guilty.[8]

It was precisely this statutorily imposed dilemma that we identified in *Jackson* as having the "inevitable effect" of discouraging assertion of the right not to plead guilty and to demand a jury trial. As recognized in *Jackson,* it is inconceivable that this sort of capital penalty scheme will not have a major impact upon the decisions of many defendants to plead guilty. In any particular case, therefore, the influence of this unconstitutional factor must necessarily be given weight in determining the voluntariness of a plea.[9]

---

[8] The only alternative to a jury trial available to Parker under the North Carolina statutes was a plea of guilty. Under the Federal Kidnaping Act, however, the possibility existed that a defendant could contest his guilt in a bench trial and simultaneously avoid a potential death penalty. Nothing more appearing, it is arguable that an individual who pleaded guilty without seeking a bench trial did so for reasons other than the fear of the death penalty.

We have previously held, however, that there is no constitutional right to a bench trial, *Singer* v. *United States,* 380 U. S. 24 (1965), and under Fed. Rule Crim. Proc. 23 the consent of both the trial judge and the prosecution is a prerequisite to the waiver of a jury trial. In *Brady* the trial judge indicated that he would not permit the case to be tried without a jury. Thus, in substance, the choice that confronted Brady—jury trial or guilty plea—was the same that faced Parker.

There is room for argument that a direct confrontation between a trial judge and the defendant would have more impact upon the accused than a statute. However, when the accused appears before the trial judge, he at least has an opportunity to present his views to the judge, and, if all else fails, to preserve a record for direct or collateral review of any overreaching by the trial court.

[9] North Carolina argues that *Jackson* ought not to be applied retroactively so as to affect guilty pleas entered prior to that decision. In one sense, of course, the *Jackson* retroactivity problem is chimerical, for the long-standing constitutional requirement that

To be sure, we said in *Jackson* that "the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily." [10] 390 U. S., at 583. But that statement merely emphasized the obvious fact that it is perfectly possible that a defendant pleaded guilty for reasons entirely unrelated to the penalty scheme, for example, because his guilt was clear or because he desired to spare himself and his family "the spectacle and expense of pro-

---

valid guilty pleas be voluntary and intelligent was not altered by that decision.

However, *Jackson* did apply the standard of voluntariness in a new context by considering the inducement to plead guilty supplied by an unconstitutional capital punishment scheme. In a sense, therefore, *Jackson* did in fact mandate a new application of the voluntariness test. To the extent that the retroactivity issue need be resolved, I have no difficulty in concluding that *Jackson* should be so applied as to provide relief for those who suffered the very constitutional vices that we condemned in that case. The entry of a guilty plea concerns the very essence of the guilt-determining process, and, if that plea is involuntarily induced, the result is "to infect a criminal proceeding with the clear danger of convicting the innocent." *Tehan* v. *Shott,* 382 U. S. 406, 416 (1966). See *Johnson* v. *New Jersey,* 384 U. S. 719, 727–729 (1966); *Linkletter* v. *Walker,* 381 U. S. 618 (1965).

[10] If this statement means that *no* plea can be rendered involuntary by the statutory scheme, it was at least an obscure, not to say highly misleading, way of saying so. *Laboy* v. *New Jersey,* 266 F. Supp. 581 (D. C. N. J. 1967), cited in *Jackson,* upon which the Court now seizes, is merely an example of a case that rejected an attack upon the voluntariness of a plea allegedly induced by fear of a death penalty. Surely it cannot be relied upon to establish guidelines with respect to the quantum of proof necessary to demonstrate the involuntariness of a plea under a *Jackson*-defective statute, particularly since the District Court in *Laboy* erroneously concluded, in dicta, that the Federal Kidnaping Act contained no constitutional infirmity.

tracted courtroom proceedings." 390 U. S., at 584. The converse, however, is equally clear: not every defendant who pleaded guilty under the Act did so voluntarily, that is, uninfluenced by the highly coercive character of the penalty scheme. This much is merely the teaching of *Jackson*.

The Court has elected to deny this latter aspect of *Jackson*, but in doing so it undermines the rationale on which *Jackson* was decided. In *Jackson* we invalidated the death penalty provision of the Kidnaping Act because the Act's penalty scheme as a whole encouraged guilty pleas and waivers of jury trial, and in the circumstances of particular cases this improper influence could render pleas and waivers constitutionally involuntary. Today the Court appears to distinguish sharply between a guilty plea that has been "encouraged" by the penalty scheme and one that has been entered "involuntarily." However, if the influence of the penalty scheme can never render a plea involuntary, it is difficult to understand why in *Jackson* we took the extraordinary step of invalidating part of that scheme. Apparently in the Court's view, we invalidated the death penalty in *Jackson* because it "encouraged" pleas that are perfectly valid despite the encouragement. Rarely, if ever, have we overturned an Act of Congress for what proves to be so frivolous a reason. Moreover, the Court's present covert rejection of the *Jackson* rationale, together with its acceptance of the result in *Jackson*, leads to a striking anomaly. Since the death penalty provision of the Kidnaping Act remains void, those who resisted the pressures identified in *Jackson* and after a jury trial were sentenced to death receive relief, but those who succumbed to the same pressures and were induced to surrender their constitutional rights are left without any remedy at all. Where the penalty scheme failed to produce its unconstitutional effect, the intended

victims obtain relief; where it succeeded, the real victims have none.  Thus the Court puts a premium on strength of will and invulnerability to pressure at the cost of constitutional rights.

Of course, whether in a given case the penalty scheme has actually exercised its pernicious influence so as to make a guilty plea involuntary can be decided only by consideration of the factors that actually motivated the defendant to enter his plea.  If a particular defendant can demonstrate that the death penalty scheme exercised a significant influence upon his decision to plead guilty, then, under *Jackson,* he is entitled to reversal of the conviction based upon his illicitly produced plea.

The Court attempts to submerge the issue of voluntariness of a plea under an unconstitutional capital punishment scheme in a general discussion of the pressures upon defendants to plead guilty which are said to arise from, *inter alia,* the venerable institution of plea bargaining.  The argument appears to reduce to this: because the accused cannot be insulated from *all* inducements to plead guilty, it follows that he should be shielded from *none.*

The principal flaw in the Court's discourse on plea bargaining, however, is that it is, at best, only marginally relevant to the precise issues before us. There are critical distinctions between plea bargaining as commonly practiced and the situation presently under consideration—distinctions which, in constitutional terms, make a difference.  Thus, whatever the merit, if any, of the constitutional objections to plea bargaining generally,[11] those issues are not presently before us.

[11] See generally *Scott* v. *United States,* 135 U. S. App. D. C. 377, 419 F. 2d 264 (1969); D. Newman, Conviction, The Determination of Guilt or Innocence Without Trial (1966); American Bar Association Project on Standards for Criminal Justice, Pleas of

We are dealing here with the legislative imposition of a markedly more severe penalty if a defendant asserts his right to a jury trial and a concomitant legislative promise of leniency if he pleads guilty. This is very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power.[12] No such flexibility is built into the capital penalty scheme where the government's harsh terms with respect to punishment are stated in unalterable form.

Furthermore, the legislatively ordained penalty scheme may affect any defendant, even one with respect to whom plea bargaining is wholly inappropriate because his guilt is uncertain.[13] Thus the penalty scheme presents a clear danger that the innocent, or those not clearly guilty, or those who insist upon their innocence, will be induced nevertheless to plead guilty. This hazard necessitates particularly sensitive scrutiny of the voluntariness of guilty pleas entered under this type of death penalty scheme.

The penalty schemes involved here are also distinguishable from most plea bargaining because they involve the imposition of death—the most severe and awesome penalty known to our law. This Court has recognized

Guilty §§ 3.1–3.4 (Approved Draft 1968); President's Comm'n on Law Enforcement & Administration of Justice, The Challenge of Crime in a Free Society 134–137 (1967); Note, The Unconstitutionality of Plea Bargaining, 83 Harv. L. Rev. 1387 (1970); Note, Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas, 112 U. Pa. L. Rev. 865 (1964).

[12] See generally D. Newman, Conviction, The Determination of Guilt or Innocence Without Trial 78–104 (1966).

[13] See, e. g., Bailey v. MacDougall, 392 F. 2d 155, 158 n. 7 (C. A. 4th Cir.), cert. denied, 393 U. S. 847 (1968): "Plea bargaining that induces an innocent person to plead guilty cannot be sanctioned. Negotiation must be limited to the quantum of punishment for an admittedly guilty defendant." (Emphasis added.)

that capital cases are treated differently in some respects from noncapital cases. See, *e. g., Williams* v. *Georgia,* 349 U. S. 375, 391 (1955). We have identified the threat of a death penalty as a factor to be given considerable weight in determining whether a defendant has deliberately waived his constitutional rights. Thus, for example, in *Green* v. *United States,* 355 U. S. 184 (1957), it was contended that a defendant initially convicted of second-degree murder upon an indictment charging first-degree murder waived his double-jeopardy objections to a second trial for murder in the first degree by taking a successful appeal. We rejected this argument, observing that

> "a defendant faced with such a 'choice' takes a 'desperate chance' in securing the reversal of the erroneous conviction. The law should not, and in our judgment does not, place the defendant in such an incredible dilemma." 355 U. S., at 193.

So, also, in *Fay* v. *Noia,* 372 U. S. 391 (1963), it was argued that the petitioner had deliberately failed to seek redress through appeal of his conviction within the state appellate process and thus was not entitled to federal habeas corpus relief. Noting that the petitioner had been confronted with the "grisly choice" of forgoing his appellate rights or facing a possible death sentence if his appeal were successful, we held that the failure to seek state appellate review, motivated by fear of the death penalty, could not be interposed to bar the federal habeas corpus remedy.[14] 372 U. S., at 438–440.

---

[14] A perceptive commentator, prior to our decision in *Jackson,* noted the interrelation of guilty pleas and an unconstitutional legislatively mandated capital punishment penalty scheme:

"It is incontrovertible that the [Federal Kidnaping] act promises a person pleading guilty at least substantial security from the imposition of capital punishment, while it threatens him with the ultimate

Finally, under our express holding in *Jackson*, the death penalty in no circumstances could have been constitutionally imposed upon these defendants.[15] If they

sanction of the law—death. Can not the statute be accurately characterized as containing a *legislative promise of substantial security* from infliction of the death penalty in the event of a plea of guilty by the defendant? Is there any legitimate reason why a defendant's guilty plea under the act should be considered any less the product of coercion because it was induced by a legislative promise of substantial immunity than is a guilty plea induced by the previously mentioned judicial offers of sentencing concessions [in *United States ex rel. Elksnis* v. *Gilligan*, 256 F. Supp. 244 (D. C. S. D. N. Y. 1966), and *United States* v. *Tateo*, 214 F. Supp. 560 (D. C. S. D. N. Y. 1963)]? Can it be seriously contended that statements given by police officers in order to avoid being discharged from their employment are any more the product of coercion than is a guilty plea made by a defendant in mortal fear of the executioner's chair [citing *Garrity* v. *New Jersey*, 385 U. S. 493 (1967)]? In a capital case where a defendant is put to plea under the Lindbergh Law, he is faced with a choice 'between the rock and the whirlpool' [385 U. S., at 498], and coercion quite probably is inherent in his choice to waive his right to a jury trial." Note, *United States* v. *Jackson:* The Possible Consequences of Impairing the Right to Trial by Jury, 22 Rutgers L. Rev. 167, 189–190 (1967). (Emphasis in original.)

[15] Of course, no malevolent intent may be ascribed to the prosecution in seeking the death penalty prior to its invalidation in *Jackson*. That the death penalty could not have been exacted in the instant cases is, however, merely a consequence of the retroactive effect of *Jackson*. While the Court denies that *Jackson* affects the validity of guilty pleas, surely the Court would not insist that a sentence of death pronounced prior to our decision in *Jackson* could now be carried out. The Court's position, if I have accurately described it, does contain a certain paradoxical element. That is, any defendant who resisted the inducements of the *Jackson*-defective penalty scheme, received a jury trial and was sentenced to death, is presumably entitled to relief. However, the defendant who succumbed to the unconstitutional influence of that same scheme and pleaded guilty is left to suffer the consequences of his illicitly induced plea. While the relaxation of strict logic may be viewed sympathetically if necessary to prevent executions under an unconstitutional penalty

had been aware of the constitutional deficiency in the penalty scheme, they might well have decided to assert their right to a jury trial since the maximum penalty that could have been imposed after an unfavorable jury verdict was life imprisonment. It is in this narrow context, involving a legislatively mandated unconstitutional death penalty scheme, that the defendant should be relieved of the rigid finality of his plea if he demonstrates that it was a consequence of the unconstitutional scheme.[16]

## II

Turning to the facts of these particular cases, I consider first the contention that the North Carolina capital punishment scheme under which Parker was convicted (*ante,* at 792–793, nn. 1, 2), was constitutionally deficient under

---

scheme, I am at a loss to understand what values are preserved by the curious inversion the Court has brought about.

[16] The Court apparently takes comfort from the authorities that it cites for the proposition that a guilty plea entered to avoid a possible death penalty is not involuntary. (*Ante,* at 755–756, n. 14.) This reliance is misplaced. In the first instance, most of these authorities antedate *Jackson* and therefore were uninstructed by that decision. For example, it does not appear in those cases whether the capital punishment scheme was defective under *Jackson* or otherwise unconstitutional. In this discussion, I do not consider the case of a death penalty scheme that is not unconstitutional under *Jackson.*

Secondly, several cases decided subsequently to *Jackson* take the position that a constitutionally defective capital penalty scheme may impermissibly induce guilty pleas. See, *e. g., Alford* v. *North Carolina,* 405 F. 2d 340 (C. A. 4th Cir. 1968), prob. juris. noted, 394 U. S. 956 (1969), set for reargument, *post,* p. 1060; *Quillien* v. *Leeke,* 303 F. Supp. 698 (D. C. S. C. 1969); *Wilson* v. *United States,* 303 F. Supp. 1139 (D. C. W. D. Va. 1969); *Shaw* v. *United States,* 299 F. Supp. 824 (D. C. S. D. Ga. 1969); *Breland* v. *State,* 253 S. C. 187, 169 S. E. 2d 604 (1969). See also *United States ex rel. Brown* v. *LaVallee,* 424 F. 2d 457 (C. A. 2d Cir. 1970); *Commonwealth* v. *Hargrove,* 434 Pa. 393, 254 A. 2d 22 (1969).

the standards set forth in *Jackson*. Although the Court assumes *arguendo* that the North Carolina statutes were indistinguishable from the Federal Kidnaping Act, this conclusion is, in my view, inescapable. Under North Carolina law as it formerly existed, the defendant in a capital case had but two choices: he could demand a jury trial and thereby risk the imposition of the death penalty, or he could absolutely avoid that possibility by pleading guilty.[17] If anything, the defect in the North Carolina statutory scheme was more serious than that in the statute considered in *Jackson*, for under the Kidnaping Act a defendant at least had a potential opportunity to avoid the death penalty and to have his guilt determined in a bench trial. Therefore, Parker is entitled to relief if he can demonstrate that the unconstitutional capital punishment scheme was a significant factor in his decision to plead guilty.

*Parker* comes here after denial of state post-conviction relief. The North Carolina courts have consistently taken the position that *United States* v. *Jackson* has no applicability to the former North Carolina capital pun-

---

[17] Sophistic arguments cannot alter the fact that this in substance was the effect of the North Carolina penalty scheme. It is contended by North Carolina, for example, that under the state statutes the actual penalty imposed upon conviction was death but that the jury had the power to mitigate punishment to life imprisonment. Under the Federal Kidnaping Act, so the argument goes, the penalty upon conviction was life imprisonment, or a term of years, but the jury had the power to increase the sentence beyond that which the trial judge could impose, thereby "usurping the province of the judge in sentencing the defendant." This is a distinction without a difference. The simple fact is that under both the Kidnaping Act and the North Carolina scheme the jury alone, in its unfettered discretion, could impose the death sentence. In both instances the defendant was promised by the legislature complete insulation from this awesome possibility if he would plead guilty.

ishment scheme.[18] Thus, the merits of Parker's contention that his plea was motivated by the unconstitutional death penalty have not been considered by the state courts. I would, therefore, reverse the judgment of the North Carolina Court of Appeals and remand the *Parker* case to that court for proceedings not inconsistent with the principles elaborated herein.[19]

## III

In 1959 Brady was indicted under the Federal Kidnaping Act. The indictment alleged that the kidnaped person had "not been liberated unharmed." Thus Brady was subject to a potential sentence of death if he demanded a jury trial.[20] He ultimately elected to plead guilty, a decision that followed a similar action by his codefendant. Subsequently Brady was sentenced to 50 years' imprisonment. There exists in the record substantial evidence that Brady decided to plead guilty because the similar plea decision of his codefendant seriously undermined his own defense. It is also true that Brady was under the impression that the maximum penalty that could be imposed following a jury trial was the death sentence.

A hearing was held pursuant to Brady's motion under 28 U. S. C. § 2255 to vacate his sentence, at which Brady, his codefendant, and their trial attorneys testified. This

[18] See, e. g., State v. Spence, 274 N. C. 536, 164 S. E. 2d 593 (1968); State v. Peele, 274 N. C. 106, 161 S. E. 2d 568 (1968).

[19] In view of my position on the Jackson issue, I need not, in this case, reach Parker's other contentions, in particular that his guilty plea was the product of his allegedly coerced confession. I would direct that Parker's allegations concerning the coerced confession be considered on remand in proceedings not inconsistent with my views as expressed in McMann v. Richardson, ante, p. 775, decided this day.

[20] As previously noted, the trial judge indicated that he would not permit Brady to be tried without a jury. See n. 8, supra.

hearing was completed after the District Court had decided the *Jackson* case, but before this Court had spoken in the matter. The District Judge took the position that the death penalty provision of the Federal Kidnaping Act was constitutional. In this respect, of course, he erred. However, the District Judge also concluded that Brady "decided to plead guilty when he learned that his co-defendant was going to plead guilty" and that this decision was not induced or influenced improperly by anything the trial judge or his attorney had told him. The District Court further found that "the plea of guilty was made by [Brady] by reason of other matters and not by reason of [the Kidnaping Act]."

The decision in the Court of Appeals for the Tenth Circuit was rendered after our decision in *Jackson*. The Court of Appeals correctly pointed out that not every plea entered under the Federal Kidnaping Act is necessarily invalid and ultimately concluded that "[t]he finding of the trial court that the guilty plea was not made because of the statute but because of other matters is supported by substantial evidence and is binding on us."

An independent examination of the record in the instant case convinces me that the conclusions of the lower courts are not clearly erroneous. Although Brady was aware that he faced a possible death sentence, there is no evidence that this factor alone played a significant role in his decision to enter a guilty plea. Rather, there is considerable evidence, which the District Court credited, that Brady's plea was triggered by the confession and plea decision of his codefendant and not by any substantial fear of the death penalty. Moreover, Brady's position is dependent in large measure upon his own assertions, years after the fact, that his plea was motivated by fear of the death penalty and thus rests

largely upon his own credibility. For example, there is no indication, contemporaneous with the entry of the guilty plea, that Brady thought he was innocent and was pleading guilty merely to avoid possible execution. Furthermore, Brady's plea was accepted by a trial judge who manifested some sensitivity to the seriousness of a guilty plea and questioned Brady at length concerning his guilt and the voluntariness of the plea before it was finally accepted.

In view of the foregoing, I concur in the result reached by the Court in the *Brady* case.