Hillsborough,
No. 5691.

STATE

*v.*

WILFRED D. FLEURY.

October 5, 1971.

*Warren B. Rudman*, Attorney General and *W. Michael Dunn*, Assistant Attorney General (*Mr. Dunn* orally), for the State.

*William P. Shea* (by brief and orally), for the defendant.

KENISON, C.J. The defendant, in his brief filed by newly assigned counsel, presents the issue in this case as follows: "Was the defendant given effective assistance of counsel by his [original] assigned counsel pursuant to his rights under the Sixth Amendment to the Constitution of the United States . . . " from the time of his arrest (January 2, 1967) to the date of his conviction. In April 1967 the defendant was convicted after trial by jury of armed robbery committed on September 3, 1965. The case was reserved and transferred to this court by the Presiding Justice, *Griffith*, J.

After the case was transferred to this court defendant's original counsel requested several extensions of time to file his brief during 1967 and 1968, and in the meantime advised the defendant that his appeal was without merit. Defendant's counsel discussed the case with several other attorneys who had the same opinion. The counsel visited the defendant at the State prison and informed him of these facts but told him that he would file a brief in his behalf setting forth the defendant's contentions. Thereafter, the defendant pro se filed various motions and petitions for habeas corpus. In July 1968, the defendant filed in the superior court a motion to vacate his sentence and grant a new trial which was denied. In April 1970, defendant filed a motion in the trial court to dismiss his counsel. In May 1970, this court ordered counsel to file a brief on behalf of the defendant, " referring to matters in the record which might arguably support[your]client's appeal. " *Anders* v. *California*, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 ( 1967 ); *State* v. *Richard*, 109 N.H. 322, 251 A.2d 326 ( 1969 ). On June 15, 1970, the defendant filed a petition for a writ of habeas corpus in the United States District Court for the District of New Hampshire which was denied. The denial of that petition was affirmed upon appeal in *Fleury* v. *Supreme Court of New Hampshire*, 432 F.2d 555 ( 1st Cir. 1970 ).

Subsequently on June 26, 1970, the defendant filed a petition for a writ of habeas corpus in the trial court. In September 1970, the trial transcript was returned to the Hillsborough County Superior Court to permit certain issues raised by the defendant's habeas corpus petition to be determined at the trial level. Thereafter, the defendant withdrew his petition for habeas corpus on January 12, 1971, when the State and William P. Shea, his newly appointed counsel, stipulated to supplement the facts in the trial transcript. The stipulation included the following two facts: " 1. That on January 2, 1967 defendant, Wilfred D. Fleury, was identified at the Manchester Police Station by Janet Brady and her daughter, Joan Brady.

" 2. Mr. Fleury appeared before them alone. "

The reserved case entered in this court on September 5, 1967 was not amended by this stipulation. There is nothing in the record of this case in this court to indicate that the issues raised by this appeal were preserved by exceptions taken by the defendant or by an express transfer of questions of law upon an agreed statement of facts. We entertain a doubt that the reservation and transfer in the reserved case of " [a]ll questions of law raised

by . . . any questions appearing in the transcript. . ." is sufficient basis for the consideration by this court of the issues briefed by newly appointed counsel. Nevertheless, we proceed to the merits of the appeal upon the basis that the stipulation supplementing the "facts" in the trial transcript was also intended to amend the reserved case and to raise the issues argued by newly appointed defense counsel. *Cf. Barton* v. *Manchester,* 110 N.H. 494, 272 A.2d 612 ( 1970 ).

On September 3, 1965, an employee of Sully's Superette in Manchester was robbed by two men who were armed with hand-guns and were wearing helmets and "real big" sunglasses. The robbery occurred at about 2:30 P.M. in the Superette parking lot where the employee was accosted by the two men while he was walking towards the Superette with a canvas bank bag containing about $4900. The two robbers fled from the scene with the canvas bank bag containing the money. They fled through some "swampy and kind of damp" woods at the edge of the parking lot toward Wheelock Street.

Edwin Gamache, who was a ten year old child playing "army" along with some friends on Wheelock Street at the time of the robbery, testified that he was about "two or three feet" from an automobile he could identify as a 1956 or 1957 blue and white Buick because his "uncle had a car something like it" when the operator of the automobile "took off fast" after the automobile was entered by two men who had run out of the woods between Sully's Superette and Wheelock Street. One of the two men was carrying a bag.

Mrs. Janet M. Brady and her daughter, Joan, testified that on September 3, 1965, at about 3 P.M., Steve Catudal, an acquain-tance of the family, came into their home with two men. Both Mrs. Brady and Miss Brady pointed out the defendant at the trial as one of the two men. Mrs. Brady noticed that the men were carrying a canvas bag, "were nervous and they had awful muddy shoes." Miss Brady noticed that the two men "were very dirty. They had like clay on their feet, and they went upstairs fast, and they were carrying a bag." Catudal turned on the television set and told Mrs. Brady that they were not going to stay long because' "he didn't want [the two men] to hear the news for fear they'd get nervous." He told Miss Brady that he wanted to get out of the home "before the news comes on" because he didn't want "his two friends" "to get nervous." Catudal had asked her what time it was and Miss Brady remembered telling him it was "around

quarter of four. " Mrs. Brady testified that the three men departed around 4 P.M.; Catudal's two friends were driven away in a "two-tone blue" Buick. Miss Brady testified that about five minutes after Catudal and his two friends had departed, she turned on the radio for the 4 o'clock news and heard that "Sully's was robbed" about 2:30 P.M. that day. She remembered that the men departed with a canvas bag.

Steve Catudal testified that he had planned the robbery of Sully's Superette and had been joined by the defendant and one Arthur Rumney, both of whom were from Portsmouth, to carry out the plan. He testified that he had been the operator of the 1956 blue and white Buick into which the defendant and Rumney had entered after they had robbed " Sully's " at about 2:30 P.M. on September 3, 1965. During the morning of the day of the robbery, the defendant and Rumney telephoned to him at their intended Manchester rendezvous point to inform him that they would be late because "[t]hey got stopped by the State Police on the highway . . . " in Auburn. He testified that while waiting in the automobile on Wheelock Street, "just as Fleury came down through the woods, there was five or six kids coming towards the car . . . playing army"; and after Rumney joined him and Fleury, "the wheels were rolling and he hadn't closed the door yet. . . ." The defendant was carrying the money. They all went to the Brady home which was " about a mile " from the scene of the crime. He said he advised Mrs. Brady not to turn on the radio " until we get out of here, and it may come over the radio. " He pointed out the defendant at the trial as one of his accomplices. Throughout his testimony, he referred to the defendant as " Danny Fleury. "

The case for the defendant consisted of an alibi witness who testified that on the day of the robbery the defendant was at her home making repairs and painting. The State called as a rebuttal witness a State trooper who testified that at about 11 A.M. on September 3, 1965 on Route 101 in Auburn he stopped a " speeding " 1956 blue and white Buick heading toward Manchester. There were two men in the automobile. The operator identified himself as Arthur Rumney and the passenger identified himself as Daniel Fleury. At the trial, the witness pointed out the defendant as the passenger.

This is the testimonial context in which the defendant asserts that he was denied the effective assistance of counsel because his original counsel did not conduct an effective cross-examination of

the Brady women, Catudal, and the State trooper.

The defendant challenges the effectiveness of the assistance given by original defense counsel in the conduct of the cross-examination in his behalf. The defendant's new counsel suggests questions that he contends should have been asked upon cross-examination. The conduct of the cross-examination by original defense counsel was generally brief and the questions suggested by new defense counsel could have been asked. But while the suggested questions, under the circumstances of this case, would have served generally as evidence that cross-examination is an art, the answer to the questions would have probably strengthened the State's case by eliciting new or repetitive testimony damaging to the defendant. Defendant's new counsel overlooks the fact that the substance of some of the points he suggests should have been elicited during cross-examination were made by original defense counsel in his final argument. For example, new defense counsel criticizes original defense counsel for not questioning Catudal as to what he may have received from the State in exchange for his testimony. But original defense counsel, based upon the evidence brought out on direct and cross-examination, stated in his closing argument to the jury that Catudal was "presently in jail," was "hardly a fellow whose story should be given much weight and credibility," and speculated "how much has been either fabricated, altered or adjusted to perhaps enhance any chances he may have in the future for his upcoming thirteen indictments," "one of which is this very crime that Mr. Fleury is charged with." *See* Stein, Closing Argument ( 1969 ) *passim.*

The alibi witness called by original defense counsel compelled the State to counter with the State trooper as a rebuttal witness. Defendant's new counsel does not criticize the decision to keep the defendant from testifying in his own defense. Perhaps, the best answer to the defendant's assertions about ineffective assistance of counsel is found in the defendant's brief where he states candidly: "Lacking such coroboration of the alibi evidence offered by his witness Stickney, the testimony of the State's four witnesses [the Brady women, Catudal, and the State trooper] was completely destructive to the defendant's plea of not guilty." Under such circumstances, and upon the record presented in this case, the recommended defense standard is: "A lawyer's belief that the witness is telling the truth does not necessarily preclude appropriate cross-examination in all circumstances, but may affect the method and scope of cross-examination. He should not misuse the power

of cross-examination or impeachment by employing it to discredit or undermine a witness if he knows the witness is testifying truthfully. " ABA Standards Relating To The Prosecution Function and The Defense Function: The Defense Function *s.* 7.6( b ) ( Approved Draft 1971 ).

The defendant's new counsel has not cited any case, and we have found none, to substantiate or suggest that the defendant's challenge to the effectiveness of the assistance given by original defense counsel in the conduct of his cross-examination on the state of this record is sustainable. *See* ABA Standards Relating To The Prosecution Function and The Defense Function: The Defense Function 5.2( b ) ( Approved Draft 1971 ).

Whether the standard of skill required of counsel is "reasonable" competence ( *McMann* v. *Richardson,* 397 U.S. 759, 770, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448 ( 1970 ) ), or "ordinary" competence ( Note, Effective Assistance Of Counsel For The Indigent Defendant, 78 Harv. L. Rev. 1434, 1435 ( 1965 ) ) original defense counsel in this case and on this record provided effective legal assistance to this defendant satisfying the requirements of his sixth amendment right to the effective assistance of counsel under the fourteenth amendment. *Petition of Graham,* 106 N.H. 545, 215 A.2d 697 ( 1965 ); *State* v. *Underwood,* 110 N.H. 413 270 A.2d 599 ( 1970 ); *State* v. *Edge,* 57 N.J. 580, 274 A.2d 42 ( 1971 ); *Commonwealth* v. *Bernier,* 267 N.E.2d 636 ( Mass. 1971 ). Judges as well as criminal defense lawyers need to be reminded from time to time that success in criminal trials and perfection in trial tactics are not guaranteed by the Constitution. "He who wars must sometimes win and sometimes lose. The Constitution, it must be remembered, commands a battle, but not a victory. " *Odom* v. *United States,* 377 F.2d 853, 859 ( 5th Cir. 1967 ). The long and short of the matter is that the conduct of defendant's original counsel in the state of the evidence in this case was "within the range of competence required of attorneys representing defendants in criminal cases. " *Parker* v. *North Carolina,* 397 U.S. 790, 797-98, 25 L. Ed. 2d 785, 792, 90 S. Ct. 1458, 1462 ( 1970 ); *see* Waltz, Inadequacy of Trial Defense Representation As A Ground For Postconviction Relief In Criminal Cases, 59 Nw. U. L. Rev. 289 ( 1964 ).

The defendant contends that the failure of his original counsel to rely on *Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 ( 1967 ) to move to suppress the in-court identi-

fication by the Brady women was an example of the ineffective assistance of his original counsel. However the challenged pretrial identification of the defendant in this case, the trial and the sentencing of the defendant all preceded *Stovall* which was decided June 12, 1967. *See* Hall, Kamisar, LaFave, Israel, Modern Criminal Procedure 78-80, 558-82 ( 3rd ed. 1969 ) and 1970 Supplement.

In applying *Stovall's* rule of the totality of the circumstances surrounding the pretrial identification of the defendant in this case, when one of those circumstances is the absence of counsel at such pretrial identification, the defendant has the burden of proving an unfairness in his pretrial lineup that created a " substantial prejudice " to the defendant's " basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him . . . . " ( *United States* v. *Wade*, 388 U.S. 218, 227, 18 L. Ed. 2d 1149, 1157, 87 S. Ct. 1926, 1932 ( 1967 ) ). In this case, on this record, no reasonable person could find that the defendant has sustained the burden of establishing such an unfairness. *State* v. *Monteiro*, 110 N.H. 95, 261 A.2d 269 ( 1970 ). The pretrial identification of the defendant by the Brady women was clearly and convincingly based upon their observation of him during the time he was in their home under the circumstances related. Their in-court identification was also on that basis, not on the basis of the pretrial identification. *United States* v. *Wade*, 388 U.S. at 240, 18 L. Ed. 2d at 1164-165, 87 S. Ct. at 1939; Pitler, " The Fruit of the Poisonous Tree " Revisited and Shepardized, 56 Cal. L. Rev. 579, 636-41 ( 1968 ). They did not mention in their testimony that they had identified the defendant at a pretrial lineup.

We conclude that the defendant received a fair trial ( *see State* v. *Rumney*, 109 N.H. 544, 258 A.2d 349 ( 1969 ) ), was accorded due process and was not deprived of the effective assistance of counsel. The defendant's conviction is affirmed, his appeals are dismissed and accordingly the order is

*Exceptions overruled.*

GRIFFITH, J., did not sit; the others concurred.