Hillsborough,
No. 5975.

STATE *v.* TIMOTHY M. McCARTHY.

December 29, 1972.

*Warren B. Rudman,* attorney general, and *Thomas B. Wingate,* assistant attorney general (*Mr. Wingate* orally), for the State.

*Paul T. Smith* and *Harvey R. Peters,* of Massachusetts, and *J. Leonard Sweeney, Jr.* ( *Mr. Peters* orally) for the defendant.

GRIMES, J. The issues before us involve the sufficiency of the evidence to support a guilty of second degree murder verdict, whether the accused was denied the effective assistance of counsel, and whether a verdict of guilty of a lesser offense should have been directed.

Defendant was indicted for murder in the first degree. He was represented by two court-appointed counsel. The jury returned a verdict of guilty of murder in the second degree. Defendant's motion to set aside the verdict was denied and defendant's exceptions were transferred by *Dunfey,* J. Defendant after acquiring new counsel then moved for a new trial, alleging among other grounds that he had been denied adequate assistance of counsel at trial. This motion was denied by *Dunfey,* J., who transferred defendant's exception.

We hold that the evidence was sufficient to support the verdict of guilty of second degree murder. There appears to be no real dispute about the facts which in substance were as follows.

On December 12, 1967, about noon, the body of Alonzo

Flanders, a resident caretaker of Leo's Rooming House in Manchester, was discovered in his bedroom in the rooming house. An autopsy performed at 5:30 p.m. that day showed that death had resulted from knife wounds in the chest and that the deceased had been severely beaten. Expert testimony put the time of death fourteen to forty-eight hours prior to the autopsy and two to five hours after the deceased's last meal and within an hour after the fatal wounds had been inflicted.

Case, a resident of the house, testified that on the evening of December 11 he was drinking at Yvette's Restaurant with the defendant who stated that he had been locked out of his room and was "going to break in the door and throw [Flanders] down the stairs". Case said defendant had made similar statements before and admitted that he had been drinking all day and was not sober that evening.

Fortin, the manager of the house, testified that he told Flanders on December 10 to padlock defendant's door the next day because his rent had not been paid. Fortin testified that at about 5 p.m. on December 11 he received a telephone call from defendant asking if he could get back into his room and stating he was going to get back in, and that he sounded "rather angry and quite boisterous". At about 7 p.m., Fortin received a telephone call from Flanders asking if he had changed his mind. When Fortin said no, the defendant who was with Flanders came on the telephone and said he was going to the police. Fortin testified also that he tried to phone Flanders at about 9 p.m. but received no response.

DeSilva, another resident of the rooming house, testified to seeing defendant in Flanders' room at about 8:50 p.m. talking to Flanders. Galanas, an employee at Yvette's Restaurant, testified that at "exactly five minutes of eight in the evening" of December 11 defendant asked him what time it was and left, returning "shortly after nine o'clock, approximately 9:10".

There was testimony from Yvette Hawson, the proprietor of the restaurant, that defendant entered about 9 p.m. on December 11, sat at the bar, and asked if she had seen Rocky St. Clair who at the time was sitting directly across the bar from him. She said defendant's face "was real flush". An employee of another cafe testified that defendant came in

between 9 p.m. and 10 p.m. on December 11 and asked if anyone had seen a gray jacket. The employee testified that defendant usually wore a black jacket and he had never seen him with a gray one.

Flanders was found lying on a day bed with blood on his face and body, and the area around the day bed was "fully covered" with blood. There were heel impressions on the floor and there was a drop of blood superimposed on one of them. An expert witness testified to a number of significant common characteristics between the heel prints and defendant's shoe and gave the opinion that it was "most probable" that some of the prints were made by defendant's shoe. He said that the blood superimposed over the heel print would indicate that the blood was deposited after the heel print was made.

The defendant testified that he was with Flanders in his room about 9 p.m., for about five minutes, that he did not kill him but returned about 10 p.m. and found him "stretched out", saw "quite a bit of blood", and left because he was scared.

We hold that this evidence taken as a whole was sufficient to sustain the jury's verdict. *State* v. *Nelson,* 103 N.H. 478, 175 A.2d 814 (1961); *State* v. *Coolidge,* 109 N.H. 403, 260 A.2d 547 (1969), *rev'd on other grounds,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). There were previous threats to do Flanders harm and there was clearly the opportunity for defendant to commit the crime. *State* v. *Gobin,* 96 N.H. 220, 73 A.2d 430 (1950). The blood on defendant's clothing, and his heel prints on the floor furnished substantial circumstantial evidence of guilt. The jury was not compelled to believe his explanation of the heel prints, and the blood superimposed over one of the prints would indicate that the deceased had bled on it after it was made, thus further implicating the defendant.

Defendant contends that his trial counsel failed to raise the defense that his condition as an intoxicated alcoholic resulted in his being unable to entertain the requisite criminal intent to support his conviction, or in a mental disease which produced the crime. *See State* v. *Jones,* 50 N.H. 369 (1871); *State* v. *Pike,* 49 N.H. 399 (1870).

It is true that whether a criminal defendant was suffering

from a mental disease which produced the crime is in this State a question of fact. Whether alcoholism resulting in intoxication can be found to be a mental disease under our rule need not be decided. The issue before us is whether defendant's counsel possessed the skill to bring them "within the range of competence required of attorneys representing defendants in criminal cases". *State* v. *Fleury,* 111 N.H. 294, 299, 282 A.2d 873, 877 (1971); *Parker* v. *North Carolina,* 397 U.S. 790, 797-98, 25 L. Ed. 2d 785, 792, 90 S. Ct. 1458, 1462 (1970); *see McMann* v. *Richardson,* 397 U.S. 759, 771, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1449 (1970).

Assuming the defense now raised to be a valid one, the failure of trial counsel to raise it under the circumstances of this case does not show that they fell below the required standard of competence. ["P]erfection in trial tactics [is] not guaranteed by the Constitution". *State* v. *Fleury,* 111 N.H. at 299, 282 A.2d at 877.

There was substantial evidence that the defendant, although not sober, was rational and lucid prior to the crime. He talked with the manager by phone from Flanders' room at about seven o'clock. He inquired about the time just before eight o'clock and left the restaurant, returning about 9:10. It is findable that the crime was committed during this period.

The defendant denied the killing. Therefore the defenses now proposed would have placed the defendant in the position of relying upon inconsistent alternatives which competent trial counsel might have considered a dangerous trial tactic. We hold, therefore, that defendant was not deprived of the effective assistance of counsel.

*Exceptions overruled.*

All concurred.