Milton SCHAFFNER, Petitioner,

v.

Louis GRECO, Warden of New York City Correctional Institution for Men, Respondent.

No. 77 Civ. 281.

United States District Court, S. D. New York.

Oct. 20, 1978.

**1.** In violation of New York Penal Law Section 200.10.

**2.** Since Schaffner was incarcerated at the time he filed his petition for a writ of habeas corpus, this court has jurisdiction to grant the writ even though he has subsequently been paroled. *Gosa v. Mayden,* 413 U.S. 665, 670 n. 3, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973); *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20

Reuss & Ruchala, Bellerose, N. Y., for petitioner; Frederick M. Reuss, Jr., Bellerose, N. Y., of counsel.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent; Robert M. Pitler, Henry J. Steinglass, Norman W. Barclay, Mark R. Dwyer, New York City, of counsel.

LASKER, District Judge.

■ In September of 1975, Milton Schaffner pled guilty in state court to bribe receiving in the second degree[1] and was sentenced to an indeterminate term of imprisonment not to exceed three years. While serving his term, Schaffner filed this petition for a writ of habeas corpus to set aside his conviction on the ground that his guilty plea was coerced by the conduct of the trial judge in violation of his due process rights under the Fourteenth Amendment.[2] An evidentiary hearing was held on February 7, 1978. The petition is granted.

L.Ed.2d 554 (1968). Indeed, "custody," as it is used in 28 U.S.C. § 2241, has been defined broadly to include release on parole, *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), and therefore this court would have jurisdiction even if the petition had been filed after Schaffner had been paroled. See also *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (person free on bail or recognizance subject to

## I.

*Factual Background*

Schaffner, who was employed as a New York City building inspector, originally pled not guilty to a two count indictment of bribe receiving and receiving an award for official misconduct.[3] He was brought to trial on September 10, 1975, in State Supreme Court. The evidence introduced against Schaffner was very damaging. The chief witness for the prosecution, Peter Roberto, an undercover agent for the City, testified that Schaffner had solicited and accepted a bribe of $150. in return for approving substandard construction work. To corroborate Roberto's testimony, the State introduced tape recordings of conversations between Roberto and Schaffner, in which a voice, allegedly Schaffner's, demanded that Roberto pay him "a yard and a half"[4] and in which a payoff appears to have been performed.

In his defense, Schaffner called Professor Louis Gerstman, a voice expert, who testified that, although Schaffner's voice could be heard on the tapes, certain critical, incriminating statements were made not by Schaffner but by an unidentified third person. Schaffner himself took the stand and testified that he had not solicited or accepted the bribe and that he lived sparingly on his modest income as a building inspector. On cross-examination, however, the prosecutor introduced evidence that Schaffner had deposited over $77,000. in four bank accounts during the years 1972 to 1974, at one time depositing $1,900. in one hundred dollar bills. When pressed, Schaffner was unable to explain how he had acquired such a large sum of money.

After cross-examination of the defendant had concluded on Friday, September 19th, the trial judge summoned counsel to the bench and informed them that if Schaffner proceeded with the trial and was found guilty by the jury, he would impose a harsher sentence than if he then entered a plea of guilty. The judge testified at the habeas hearing that he made the following statement:

"If this case goes all the way and this jury convicts this defendant, I certainly am not going to give him anything less than five years and the maximum penalty for this is seven years, so he could get something in the neighborhood of anywhere from five to seven years."

"I indicated that if he took a plea at this particular time, that I would impose a sentence, the maximum of which would be four years."[5] (Transcript, 128)[6]

Although the jury had apparently either been dismissed by this time or was out of earshot,[7] Schaffner, who was still sitting at the witness stand, overheard the conversation.

Schaffner did not change his plea at this time but met with his attorney, Michael Dowd, over the weekend to decide how to

restraints which permit petition for writ of habeas corpus); *Carafas v. LaVallee, supra,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (civil disabilities and burdens suffered by inmate following unconditional release permit maintenance of habeas action filed prior to release).

3. In violation of New York Penal Law Section 200.10 and Section 200.25.

4. Roberto testified that "a yard and a half" is an expression commonly used to refer to $150 (Trial Transcript, 334).

5. Schaffner apparently misunderstood the terms of the judge's proposal, believing that the judge would impose a sentence of "five *to* seven" years if convicted even though no such sentence is possible under New York's penal law. It is not clear whether this confusion was ever dispelled. (See Transcript, 22–23, 87–88)

If not, it is reasonable to conclude that it added to Schaffner's fear of the consequences of a conviction.

6. All references to the transcript of the habeas hearing are marked (Transcript); all references to the transcript of the trial are marked (Trial Transcript).

7. The judge testified at the hearing that the jury was never present during the plea discussions (Transcript, 125). The assistant district attorney also testified that the jury had been excused for the day (Transcript, 146). Mr. Dowd testified that he was uncertain whether or not the jury had been dismissed (Transcript, 82–83) but that the conversation took place at the bench, some twenty-five feet from the jury box (Transcript, 63).

deal with the damaging testimony concerning his bank accounts. Dowd testified at the hearing that at their meeting Schaffner seemed "very, very, very depressed." (Transcript, 67) He complained that he was not getting a fair trial and that the judge was hurting him in front of the jury; "he was yelling at me yesterday," he told Dowd, "he's determined to railroad me." (Transcript, 66–67) When Dowd questioned him about the bank records, Schaffner said that he could explain where the money came from but that it would not make any difference since the judge "is trying to kill me." (Transcript, 67) Nevertheless, Schaffner did not at that time decide to change his plea. (Transcript, 100–01)

On Monday, September 22nd, before the trial resumed, the judge again summoned counsel to the bench [8] and spoke with them, out of the hearing of both the jury and the defendant, about the possibility of a plea. The judge testified that he had said to Dowd that if Schaffner would change his plea to guilty, he would impose a sentence of only "zip to 3" (Transcript, 131–32), that is, an indeterminate sentence with a maximum of three years of imprisonment. After being told what the judge said and discussing it with Dowd for approximately three quarters of an hour, Schaffner decided to enter a plea of guilty.

At sentencing, on November 13, Schaffner moved to withdraw his plea on the ground that it had been coerced by the threatening conduct of the judge at trial. The court characterized the motion as "a sham and an outrage" (Trial Transcript, 12a) and denied it. Schaffner was then sentenced to an indeterminate term with a maximum of three years of imprisonment.

In his petition, Schaffner contends that the change of plea was induced by the trial judge's repeated threats of a heavier sentence in the event the trial continued, together with the contempt and incredulity with which he treated the defendant and his witnesses before the jury. Schaffner charges that, by the tone of voice he used, his facial expressions and the manner of his questioning defense witnesses, the judge continually gave the jury the impression that he considered the defendant guilty. Because of this alleged prejudicial conduct, Schaffner claims that he concluded he had no chance of acquittal and had no practical choice but to plead guilty.[9]

## II.

*Discussion*

A plea of guilty satisfies due process if it "reflects the considered choice of the accused, free of any factor or inducement which has unfairly influenced or overcome his will," *United States v. Gilligan,* 256 F.Supp. 244, 253 (S.D.N.Y.1966) (Weinfeld, J.) See *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). The issue is not whether Schaffner is actually guilty of the offense as charged or whether the trial judge intended to coerce his plea, *United States v. Tateo,* 214 F.Supp. 560, 564, 566 (S.D.N.Y.1963). Rather, the decision turns on "what was said and its probable effect" on the defendant, *United States v. LaVallee,* 319 F.2d 308, 315 (2d

8. Although the judge stated at Schaffner's sentencing that the plea discussion on Monday morning was initiated at Dowd's request (Trial Transcript, 21a, 31a), both he and Dowd testified at the hearing that the judge called counsel to the bench on Monday to discuss the possibility of a plea (Transcript, 131, 70).

9. The State contends that Schaffner is barred from collaterally attacking the conduct of the judge since his guilty plea constituted a waiver of claimed prior constitutional defects at trial. It relies for this proposition on the "Brady trilogy": *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); and *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970). However, the rule of *Brady* is predicated on a finding that a guilty plea is made voluntarily, see *Brady, supra,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747. Thus the State's argument begs the question since Schaffner's claim is precisely that his plea was not voluntary but was induced by the conduct of the judge. See *Lefkowitz v. Newsome,* 420 U.S. 283, 288, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975); *Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

Cir. 1963) (Friendly, J., concurring and dissenting). As Judge Weinfeld noted in a similar context such a determination cannot be made with "mathematical precision" but depends upon "an evaluation of psychological factors and elements that may be reasonably calculated to influence the human mind." *United States v. Tateo, supra,* 214 F.Supp. 560, 565.

■ The key "factor" in the case at hand is the impact which the conduct of the trial judge had on Schaffner's decision to plead guilty. New York law permits participation by the judge in plea negotiations, see *United States ex rel. Selikoff v. Commissioner of Correction,* 524 F.2d 650 (2d Cir. 1975); *United States v. Follette,* 395 F.2d 721 (2d Cir. 1968); *United States v. LaVallee,* 319 F.2d 308 (2d Cir. 1963), but distinguishes between remarks which provide a defendant with "a fair description of the consequences attendant upon the prisoner's choice of plea," and those which induce a plea "by enticement or threat." *United States v. LaVallee, supra,* 319 F.2d 308, 314.

Moreover, it would be unrealistic not to recognize that, because of the unmatched power which a trial judge exerts over the fate of the defendant, any action on his part is enormously significant to the defendant. In *United States v. Werker,* 535 F.2d 198, 202 (2d Cir. 1976), the Court of Appeals described the "subtle pressures" created by the participation of the trial judge in plea discussions:

"[The government's] arguments fail to consider, however, that quite apart from the sentencing process, the defendant may in fact be prejudiced or believe himself to be prejudiced if he does not plead guilty in response to the judge's proposed sentence. The defendant must view the judge as the individual who conducts the trial and whose rulings will affect what the jury is to consider in determining guilt or innocence. The defendant may therefore be reluctant to reject a proposition offered by one who wields such immediate power." [10]

■ The circumstances leading up to Schaffner's change of plea provide persuasive support for his claim that he was coerced by the judge to plead guilty. The trial judge played a major role in the plea negotiations, not simply participating but actually initiating both the Friday and Monday conversations.[11] Moreover, these discussions were not initiated prior to trial, when Schaffner could have contemplated the alternatives with relative objectivity but at a time when Schaffner was shaken and vulnerable following the introduction of extremely damaging testimony. Cf. *United States v. Tateo, supra,* 214 F.Supp. 560, 567.[12] Furthermore, rather than simply adhering to the terms of the proposal made on Friday, the judge offered Schaffner an added incentive to plead guilty on Monday by proposing a new, lower sentence in exchange for the plea.

**10.** The classic description of the relationship between the defendant and the judge was given by Judge Weinfeld in *United States ex rel. Elksnis v. Gilligan,* 256 F.Supp. 244, 254 (S.D. N.Y.1966):

"The unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, at once raise a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not. A defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence. One facing a prison term, whether of longer or shorter duration, is easily influenced to accept what appears the more preferable choice. Intentionally or otherwise, and no matter how well motivated the judge may be, the accused is subjected to a subtle but powerful influence." (footnotes omitted).

**11.** See note 8 *supra.*

**12.** "With the normal strain under which a defendant labors during a trial, greatly intensified by the cumulative impact of the testimony offered against petitioner by his codefendant, who had become a Government witness, the Court's advance announcement of the prospective sentence and, based thereon, the strong urging of his own counsel to plead guilty, it is difficult to believe that the defendant had that capacity for reasoned choice, that freedom of will which is essential to a voluntary plea of guilty." (footnotes omitted).

By any objective standard, these repeated offers of diminishing prison terms at mid-trial come dangerously close to enticement of a plea. Added to these considerations is the fact that, fairly construed, the record establishes that Schaffner, whose perceptions determine whether or not the plea was coerced, *United States v. Werker, supra,* 535 F.2d 198, 202, was convinced that the conduct of the trial judge would lead to his conviction. Schaffner testified before this court that he felt that the trial judge had made up his mind at the audibility hearing that he was guilty and continually discredited him and his witnesses at trial.[13] (Transcript, 8, 49–50) Dowd testified that Schaffner repeatedly complained during their weekend meeting that the judge was trying to "railroad" him and was "killing" him before the jury. (Transcript, 66–67)

There is ample evidence in the record that Schaffner's belief was reasonable and not simply the exaggerated reaction of the accused. Both Dowd and Joseph J. Cullen, an observer at the trial for the building inspectors' union, testified at the hearing that the judge constantly belittled the defense at trial. Dowd testified that, during the defense case, the judge would "roll his eyes and look up at the ceiling or grimace at the witness in wonderment" (Transcript, 56), that he used a "contemptuous" tone when referring to Schaffner or Dowd and, on several occasions, including during Schaffner's testimony, stood over the witness and shouted at him (Transcript, 57). Cullen testified that, during Schaffner's examination as to the bank accounts, the judge "was raising his eyes at the ceiling . . . and looking over at the jury and looking down at the defendant and shrugging his shoulders at times, tapping on the desk with the pencil or something in that manner . . ." (Transcript, 111) When Schaffner was questioned about the $77,000., Cullen testified, the judge stood up and leaned over the defendant, waiting for his answer. (Transcript, 112)

While neither of these men was wholly unbiased, their testimony was credible, particularly that of Dowd, who was placed in the difficult position of antagonizing a judge before whom he may very well appear in the future. Moreover, while the trial transcript does not reveal nuances of voice or manner, it does show that Dowd made innumerable objections at trial to the tone of voice and gestures of the judge.[14] It also establishes, as indicated in the margin,[15] that the judge was a dominant figure at trial, that he participated extensively in the questioning of witnesses and conducted the cross-examination of the defendant and

---

**13.** Schaffner testified that, after listening to the tapes, the judge said, "I heard his voice on the tape. This man going to take a plea?" (Transcript, 8) According to Dowd, the judge said, "If that's not Schaffner's voice I'll eat those drapes." (Transcript, 55)

**14.** For example, Dowd made the following objections during the examination of Professor Gerstman:

"The manner in which the Court conducted itself during the—the manner being the speech, the tone and the intonation, the expressions of your Honor during the examination of Mr. Gerstman by myself, and the questions posed by the Court, in direct contrast to the manner and actions of the Court in respect to the prosecution's case, evidenced, in my opinion, a highly prejudicial attitude by this Court, which is—which, I submit, your Honor, is being ascertained by the jury at this point," (Trial Transcript, 617); and during the examination of the defendant:

"Your Honor, I object to your Honor's manner in standing over the witness, your tone of voice, which I think is intimidating, your Honor, in respect to the witness." (Trial Transcript, 837)

See also, Trial Transcript, 39, 71, 394, 568, 579, 647, 680–81, 833, 836, 855.

**15.** The judge asked the following questions concerning the money in Schaffner's bank accounts:

"THE COURT: During those two years, did you make deposits in excess of the salary you received as a construction inspector from the City of New York?

MR. DOWD: Objection, your Honor.

THE COURT: $13,000 a year? Overruled.

THE WITNESS: No.

THE COURT: In other words, you're saying you did not make deposits in those four account in excess of $26,000?

THE WITNESS: I'd have to go and get and find out where—where I transferred money from one place to another. You're asking me if I deposited from my savings or you're

the chief defense witness, Professor Gerstman, virtually singlehandedly. In light of the searching questions put by the judge to the defendant and his witnesses on points critical to the defense, it is altogether reasonable to infer that Schaffner came to view the judge as an adversary rather than an impartial mediator.

The state argues, nevertheless, that Schaffner pled guilty because he realized that the evidence of his guilt was so overwhelming that he had no chance of acquittal. However, the record indicates that Schaffner clung to the notion of his innocence and was not deterred by the evidence alone from proceeding to a verdict. Dowd testified that, during their weekend meeting, Schaffner seemed more concerned with the impact which the judge was having on the jury than with the effect of the bank account testimony, and, even though the full significance of this testimony had probably sunk in by Monday morning, Schaffner appeared in court ready to proceed with the trial. Following the judge's second plea proposal on Monday, Schaffner again hesitated to change his plea but, according to Dowd, said to him:

"Look, Mike, I'm not guilty, but I'm going to get killed and I'm going to go to jail for five or seven years . . . You know, if it's this bad now, what's he going to do when he instructs the jury on the law? He's going to put me—you know, tell them to convict me." (Transcript, 75) [16]

Moreover, Schaffner moved to withdraw his plea shortly after the trial ended when he appeared for sentencing. Taken together, these factors indicate that, while certainly conscious of the evidence against him, Schaffner cannot be said to have pleaded

trying to say that I got it in the Building Department.

THE COURT: I'm not trying to say anything, I'm asking you.

THE WITNESS: I don't know how much—

THE COURT: Did you make deposits in those bank accounts? He's asking you whether you made deposits in those bank accounts in excess of $77,000 during that two-year period of time?

THE WITNESS: I can't give you an answer to that.

THE COURT: You cannot say definitely you did not?

THE WITNESS: I don't know what amount I transferred around.

THE COURT: Where would you get $77,000 to put into four bank accounts if you earned $13,000 a year?

THE WITNESS: I don't have $77,000 in those bank accounts.

THE COURT: He didn't ask you that, sir, he asked you whether or not you deposited $77,000.

THE WITNESS: I don't know how much I deposited." (Trial Transcript, 897–99)

and concerning the erasure from Schaffner's route sheet of the appointment during which the bribe was allegedly consummated:

THE COURT: What would be the reason for you to erase the route—to erase anything that you placed down in the remarks column to the effect that you were visiting 30 Cooper Square?

THE WITNESS: This is only a reminder I had an appointment that—at 30 Cooper Square.

THE COURT: Were you doing anything illegal at 30 Cooper Square?

THE WITNESS: No.

THE COURT: Did you go to 30 Cooper Square according to your testimony, to examine plans for alteration on the tenth floor?

THE WITNESS: Yes, sir.

THE COURT: Were you doing that in the service of the Building Department and the community of the City of New York?

THE WITNESS: Yes, sir.

THE COURT: And you put it down there; is that correct?

THE WITNESS: That's the way I testified.

THE COURT: And you examined plans; is that correct?

THE WITNESS: Right.

THE COURT: You erased it?

THE WITNESS: It's just an appointment.

MR. DOWD: Your Honor, I object to your questions.

THE COURT: Overruled." (Trial Transcript, 824–26)

See also, Trial Transcript, 800–01, 820–21, 826–28, 834–35, 848–49, 850–52, 854–55, 861–62, 897–913, 932–35.

16. Dowd also testified that the following conversation took place between the two:

"I said, 'Look, I have talked to [the judge] and if you plead guilty you are going to have to say you are guilty.'

He said, 'But I'm not guilty.'

I said, 'If you want to plead guilty and you intend to plead guilty we are going to have an allocution, and quite simply, Milton, it means you are going to have to lie if you are not guilty if you want to take the plea.' " (Transcript, 73)

guilty solely because of this evidence, but rather, the deciding factor in his mind was his fear of the judge.[17]

Since Schaffner's plea was made under circumstances which deprived him of the "capacity for reasoned choice . . . which is essential to a voluntary plea of guilty" *United States v. Tateo, supra,* 214 F.Supp. 560, 567, the petition is granted, and the conviction will be set aside unless within ninety days Schaffner is granted a new trial.

It is so ordered.

17. The State also argues that incentives to plead guilty of a far more coercive nature than those present here have been found constitutional, relying on the recent decision in *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), in which the Supreme Court upheld the conduct of a prosecutor who offered either to recommend a sentence of five years if the defendant pled guilty to a lesser charge or, if he refused, to reindict him on a charge carrying a mandatory life term under a state recidivist statute.

We do not find that *Bordenkircher* supports the State's position here. The *Bordenkircher* court noted that it was dealing with the " 'give-and-take negotiation common in plea bargaining between the prosecution and the defense which arguably possess relatively equal bargaining power.' " 434 U.S. 357, 362, 98 S.Ct. 663, 667, 54 L.Ed.2d 604, quoting from *Parker v. North Carolina,* 397 U.S. 790, 804, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970). It cannot be argued that the same equality of bargaining power exists when the judge and the defendant are on opposite sides of the plea bargaining process, see *United States v. Werker, supra,* 535 F.2d 198, 202; *United States v. Gilligan, supra,* 256 F.Supp. 244, 254. Moreover, apart from the role played by the judge in the plea negotiations here, other pressures, such as the timing of the offers at mid-trial and the conduct of the judge during trial exist in this case and distinguish it from *Bordenkircher.*

We also disagree with the contention of the State that the difference between a sentence of 0–3 years or 0–5 years is too slight to induce a plea of guilty. Assuming that Schaffner would have been paroled after serving one-third of either sentence, he would have been released after one year under the shorter sentence and after one year and eight months under the longer one. We do not agree that an extra eight months of incarceration, nearly double the amount of prison time, would not seem significant to any defendant and particularly a first offender, which Schaffner was.