J. L. CHAVIERS *v.* STATE of Arkansas

CR 79-148                                                    588 S.W. 2d 434

Opinion delivered October 29, 1979
(Division I)

7

*Drake, Bynum & Dennis, Ltd.,* for appellant.

*Steve Clark,* Atty. Gen., by: *Ray Hartenstein,* Asst. Atty. Gen., for appellee.

JOHN A. FOGELMAN, Justice. Appellant J. L. Chaviers, the operator of Chaviers Insurance Agency, Inc., an insurance agency in Pine Bluff, Arkansas, was found guilty of eight counts of theft of property and sentenced to two years and a fine of $1,000 on each count with the sentences to run consecutively. He asserts four points for reversal. They are:

I

THE TRIAL COURT COMMITTED ERROR IN REFUSING TO GRANT APPELLANT'S MOTION FOR A MISTRIAL.

II

THE EVIDENCE BEING WHOLLY INSUFFICIENT, THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO GRANT APPELLANT'S MOTION FOR A DIRECTED VERDICT FOR APPELLANT ON COUNT 1, COUNT 2, COUNT 4, COUNT 5, COUNT 6, COUNT 7, COUNT 8 AND COUNT 9.

III

THE TRIAL COURT COMMITTED ERROR IN REFUSING TO GRANT APPELLANT'S MOTION TO SET ASIDE THE VERDICT OF THE JURY ON COUNT 7 AND COUNT 8.

IV

THE SENTENCE PRONOUNCED BY THE COURT WAS EXCESSIVE AND CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS.

We find no merit in points I and IV. We do find merit in Point III and in that portion of Point II relating to Counts 7 and 8 of the nine counts in the information on which Chaviers was tried. We affirm the judgment of the trial court as to Counts

1, 2, 4, 5, 6 and 9 of that information. Chaviers was acquitted on Count 3. The judgment is reversed as to Counts 7 and 8.

I

Appellant moved the court to declare a mistrial because of conversations between witnesses under sequestration[1] and a spectator who was interested in the trial. Mr. Patrick Lee, an employee of Southwestern Insurance Group, a group of companies represented by the Chaviers Agency, was present at the trial. Some of the charges against Chaviers were based upon contentions that he had accepted and taken control of premiums paid to him for the issuance or renewal of policies by Southwestern Insurance Company, without having obtained the policies or renewals or without remitting the premiums for them to the company. Robert Malcomb, the underwriting manager for the Southwestern Insurance Group, was a witness for the state. James A. Fecho, a branch manager with Transamerica Insurance Company, was also a witness called by the state. Appellant's motion for a mistrial was made after Fecho had testified, but before Malcomb's testimony was given.

Appellant's wife testified at the hearing on the motion. She said that each time a witness had left the stand, all of the witnesses, who were sitting together, had discussions and looked and pointed and apparently discussed what had been said in the courtroom. She said that she did not hear what Lee said to Malcomb or any other witness to whom he had talked, but that they all stood in front of Lee and appeared to be giving information as to their testimony. At that time, an independent insurance agent had testified as to practices of insurance companies in billing agencies and an insurance

---

[1]We treat this matter as if the witnesses had been excluded from the courtroom without any request having been made by either party and without any admonition having been given by the circuit judge. Although the record is not clear on this point, appellant states in his brief that the witnesses involved in the alleged conversations had been excluded under the rule. Mrs. Chaviers testified that she saw the spectator in question coming out of the courtroom and coversing with witnesses who were sitting outside. She must have been outside the courtroom herself in order to observe any such conversations. It seems highly improbable that she would have been in a position to observe unless she had been excluded from the courtroom.

salesman for another insurance company had testified about placing liability insurance coverage for one of the complaining witnesses with the Chaviers agency. In addition to these witnesses, Mary E. Johnson, Ray Heaslip and Bobby Davis, who were complaining witnesses, had testified.

Sandra Masters, appellant's daughter, testified that she had been sworn as a witness and had seen Lee going in and coming out of the courtroom and had seen him talking to some man and others who were witnesses. She did not know what Lee was saying or what kind of conversation was going on. She had been sitting with Mrs. Chaviers.

Lee testified that his major purpose in being present was to visit with Malcomb, and that he had lunch with Malcomb and Fecho. He said that he had not discussed the case with the state's witnesses. Mrs. Taylor, one of the complaining witnesses, testified that she had spoken with some of the witnesses when they left the courtroom after testifying, but not about the case nor about their testimony or anything that took place in the courtroom and that she did not hear anything about the testimony. Doris Weaver, a complaining witness, said she had spoken to some of the witnesses who had testified and that she had asked one of the insurance agents what had happened and had been told that it was only routine. Jimmy Ragsdale, a complaining witness, said that the witnesses who were sitting in the hall had engaged in general conversations, but that he did not know who had testified and who had not. He had observed that some of the witnesses, after they had testified and left the courtroom, had spoken with the other witnesses, but he did not hear the conversations.

Malcomb testified that some of the witnesses who had testified had talked with witnesses who had not, but that he had not talked with any witnesses who had testified. He said that he had talked to Lee about what had happened between Chaviers and their company, but not about what went on in the trial. He said that he did talk about the facts of the case as he knew them. Malcomb recalled that Lee had told him about testimony that had been given in the courtroom in

regard to a question about the difference between an account current agent and a direct bill agent.

After hearing this testimony, the trial judge stated that there had been no request to sequester the witnesses or to give a cautionary instruction to them, but that he had probably erred in failing to request that the witnesses not discuss the case or visit with each other during the course of the trial. In denying the motion for mistrial, the circuit judge remarked that granting a motion for mistrial was pretty drastic action and that, from what he had heard, he doubted that any harm to either side had really been done.

We have many times said that declaring a mistrial is an extreme and drastic remedy which should be resorted to only when there has been an error so prejudicial that justice could not be served by continuing the trial. *Holmes* v. *State,* 262 Ark. 683, 561 S.W. 2d 56; *Limber* v. *State,* 264 Ark. 479, 572 S.W. 2d 402; *Wilson* v. *State,* 261 Ark. 820, 552 S.W. 2d 223; *Shackleford* v. *State,* 261 Ark. 721, 551 S.W. 2d 205; *Foots* v. *State,* 258 Ark. 507, 528 S.W. 2d 135. The granting or denial of a motion for mistrial lies within the sound discretion of the trial judge and the exercise of that discretion should not be disturbed on appeal unless an abuse of that discretion is shown. *Parrott* v. *State,* 246 Ark. 672, 439 S.W. 2d 924; *Jackson* v. *State,* 245 Ark. 331, 432 S.W. 2d 876. The facts revealed here do not afford any basis for our saying that the trial judge abused his discretion in denying this motion for mistrial. See *Hutcherson* v. *State,* 262 Ark. 535, 558 S.W. 2d 156.

## II

In each count of which he was convicted, Chaviers was charged with having committed the crime of theft of property by unlawfully and knowingly taking unauthorized control of property of another in excess of $100. Each count named the alleged victim. They were: Count 1, Mary J. Ragsdale; Count 2, Eugene Morgan; Count 4, Doris Weaver; Count 5, Anthony D. Johnson; Count 6, Arthur Lee Bradley; Count 7, Transamerica Insurance Group; Count 8, Mrs. Jack Taylor; and Count 9, Bobby Davis.

The statute under which Chaviers was charged, Ark. Stat. Ann. § 41-2203 (Repl. 1977), provides that one commits theft of property if he knowingly takes or exercises unauthorized control over the property of another with the purpose of depriving the owner thereof. Under that section there is a wrongful appropriation when the actor either takes or exercises unauthorized control over the property of another. The term "exercises unauthorized control" is directed at the bailee who lawfully takes control of the property, but subsequently appropriates it to his own use. But the term must be read in conjunction with the clause "purpose of depriving the owner thereof." A deviation from the terms of bailment is theft only if done with the requisite purpose to deprive the bailor. See Commentary, § 41-2203.

The word "property" includes any paper or document that represents or embodies anything of value. "Deprive," in the statute, according to Ark. Stat. Ann. § 41-2201 (4) (a) and (c) means:

> (a) to withhold property or to cause it to be withheld either permanently or under circumstances such that a major portion of its economic value, use, or benefit is appropriated to the actor or lost to the owner; or
>
> *****
>
> (c) to dispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely.

The offenses were alleged to have occurred during the years 1975, 1976 and 1977. There seems to be no doubt that Chaviers or employees of his agency took control of checks tendered for payment of premiums on insurance policies to be issued or renewed. The question is whether Chaviers purposely withheld or used these payments in a manner that their use or benefit was appropriated to Chaviers' benefit or lost to the owner. One acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result. Ark. Stat. Ann. § 41-203 (1) (Repl. 1977). Thus, the purpose

required is not significantly different from the previous requirement of specific intent in cases of larceny and embezzlement. See *Gilcoat* v. *State,* 155 Ark. 455, 244 S.W. 723; *Mason* v. *State,* 32 Ark. 238; *Heath* v. *State,* 207 Ark. 425, 181 S.W. 2d 231; *State* v. *Guthrie,* 176 Ark. 1041, 5 S.W. 2d 306. By the nature of things, one's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances shown in evidence. *Smith* v. *State,* 264 Ark. 874, 575 S.W. 2d 677; *Shell* v. *State,* 184 Ark. 248, 42 S.W. 2d 19. We have uniformly held that intent might be inferred from the circumstances connected with the transaction in larceny and embezzlement cases. *Mason* v. *State,* supra; *Bond* v. *State,* 230 Ark. 962, 328 S.W. 2d 369; *Collins* v. *State,* 184 Ark. 20, 41 S.W. 2d 781; *State* v. *Guthrie,* supra. We have also held that the criminal intent to embezzle may be inferred from the act of wrongful conversion of a fund. *Heath* v. *State,* supra; *Smith* v. *State,* 219 Ark. 829, 245 S.W. 2d 226; *Gurley* v. *State,* 157 Ark. 413, 248 S.W. 902. There is no sound reason why the kind of evidence or quantum of proof required to show "a conscious object" should be different from that required to show specific intent.

In pointing out the pertinent testimony on the question of sufficiency of the evidence, we will view the evidence in the light most favorable to the state, considering only that testimony that lends support to the jury verdict and disregarding any conflicting testimony which could have been rejected by the jury on the basis of credibility.

Chaviers had operated the agency until his license was revoked in August or September, 1976. All moneys paid to the agency were deposited in a bank account which was totally depleted on August 9, 1977. After the license was revoked, Chaviers, in February, 1977, began to bid on demolition contracts in Little Rock. Thereafter, he spent not more than one or two hours per day in the insurance office and devoted considerable time to the demolition business, leaving the handling of matters pertaining to his insurance business to his wife and daughter, who had been employed in the agency since 1973. They were paid salaries throughout

their employment. The new business was so unsuccessful that Chaviers discontinued it in July, 1977, after having suffered a loss of approximately $6,000. Chaviers testified that he utilized the agency bank account to pay expenses of his demolition business.

J. L. Stone worked with Chaviers occasionally and Chaviers compensated Stone by giving him the premium for the first year on any policy solicited by Stone. Among the insurance companies represented by the Chaviers agency were: Southwestern Insurance Company, Cavalier Insurance Company, New Hampshire Insurance Company, and Transamerica Insurance Group. Southwestern Insurance Company terminated the Chaviers agency by letter dated January 24, 1977. An officer of Southwestern wrote Chaviers on March 12, 1977, advising him that his attempts to renew policies of the company would not be carried through and returned seven renewal requests with that letter. Chaviers acknowledged that his authority to act, even on renewals, was then terminated. It is possible that Chaviers had an agreement with the company to renew policies that terminated in February, 1977. On renewals, this company's billing procedures were such that a lapse of two or three months between the company's receipt of a request for renewal and a statement calling for payment of the renewal premium was not unusual. Chaviers' agency for New Hampshire Insurance Company was terminated in October, 1975.

Chaviers' agency for Transamerica extended from August, 1973, until April 26, 1976. He had no authority to write new business after July 26, 1976 or renewals after July 26, 1977. His contract with that company was terminated May 15, 1977.

The agency received a letter from the insurance commissioner around July 1, 1977, but, having had her "fill" of this official, Mrs. Chaviers put the unopened letter in a desk drawer where it remained unopened until November, 1977, after Chaviers had been arrested on the original charge contained in the information filed against him, i.e., the Ragsdale transaction. When the letter was opened, complaints of Mrs.

Weaver and Mrs. Ragsdale about the handling of their transactions were attached.

The evidence on all counts followed a similar pattern, particularly those in Counts 1, 2, 4, 6 and 9. In each case, a customer of the agency issued a check to the Chaviers agency for an insurance policy or a renewal of an existing policy. All seem to have been automobile insurance. The checks were dated on various dates between January 27, 1977 and March 12, 1977. The proceeds of the checks went into the agency bank account. Receipts for the premium payments were issued by the Chaviers agency, but the policies were not renewed. These customers learned that the policies had not been renewed. Some of them learned they had no coverage after claims had arisen. None of them received a refund of the money paid for the insurance premium, although all except Mrs. Ragsdale and Mrs. Weaver had sought a refund.

Eugene Morgan (Count 2) talked with Mrs. Chaviers after a claim had arisen prior to the date he gave the check for renewal and was told by her that he would be advised as soon as the agency heard from the company. Finally, on June 15, 1977, he learned by inquiry of Southwestern Insurance Company that his policy had not been renewed and had expired in February, 1977. When his automobile was repaired in July or August, 1977, Chaviers advised Morgan that $200 was deductible under the policy. Morgan checked the policy and found that only $100 was deductible. Nothing was ever said to Morgan by anyone connected with the Chaviers agency about the non-renewal of the policy. Chaviers admitted that Morgan was entitled to a refund of $176, but sought to excuse the failure to make it by saying that the agency had not received any notice of rejection of the request for renewal mailed by him to the company on March 9, 1977 (three days before the date of Morgan's check). He said that no remittance had been made to the company because the agency was never billed for the premium.

Doris Weaver (Count 4) received a notice from Southwestern Insurance Company, two weeks after she had given her check to the Chaviers agency, that her policy had been cancelled for non-payment of premium. When she inquired

of Chaviers, he told her that "it was shuffled up in paper work," that she was insured and that she should not worry. When she had a collision in June, 1977, approximately four months after she had paid the renewal premium, Chaviers promised to send in an accident report showing her coverage, but apparently did not. About two weeks later, after she had been involved in another collision, Chaviers told her that she had nothing to worry about, but did not tell her that she had no coverage. She also made a later payment for another renewal. Her request for a refund in June, 1977, was postponed by Chaviers because of unavailability of his records.

When Arthur Lee Bradley (Count 6) had not received a policy two weeks after he had given his check on March 3, 1977, a secretary in the agency office told him the policy would be mailed. About two months later, he called the agency office and was told that it had "folded." The insurance company had nothing in its records pertaining to Arthur Bradley or any payment from Chaviers on Bradley's account, and its underwriting manager said that Chaviers had no authority on the date the agency took Bradley's check to send in a premium for a policy for Bradley.

Payments made by Bobby Davis (Count 9) in January and February, 1977, were for renewal of a Transamerica policy which had expired on December 19, 1976. On December 20, 1976, there had been a theft of some items from the Davis car. Chaviers told Davis to send an estimate, but that there might be some difficulty because the policy had terminated. After Davis had been in an accident following his premium payments, he learned that his policy had been cancelled for non-payment. He had received no notice that his policy would not be renewed. Chaviers testified that the agency records showed that a refund check had been mailed to Davis, but admitted that there was no cancelled check on the agency account for this refund.

The transaction involved in Count 5 was slightly different. Mary E. (Mrs. Anthony D.) Johnson applied to Stone for farm liability insurance to be procured through the Chaviers agency on June 7, 1975, and gave Stone a check for $160. Stone cashed the check and paid Chaviers for the policy in cash, for which a receipt was issued. The money

was deposited in the agency bank account. Stone did not receive any refund of this premium and did not receive a letter dated July 26, 1975 from Chaviers enclosing a check for a refund of the premium. It is admitted that no refund check ever cleared the Chaviers agency bank account. On June 16, 1975, Chaviers assured Mrs. Johnson that the Johnsons were covered by insurance. On August 6, 1975, he told her he had mailed the policy to them. The Johnsons never received a policy or a refund. The branch manager of New Hampshire Insurance Company, on which the Johnson policy was to have been written, said that sometime in September, 1975, before Chaviers' agency for that company was terminated in October, 1975, he had spoken with Chaviers about the Johnson policy and that Chaviers had stated that he had received no money from Stone for that policy and he had so advised the Johnsons, but mentioned no refund to Stone. Chaviers made no offer to refund the premium to the Johnsons until May 20, 1976, when a hearing was being held by the insurance commission on a complaint against Chaviers.

Appellant says that the evidence is wholly circumstantial, so it must exclude every other reasonable hypothesis other than his guilt. He enumerates several circumstances upon which he relies as being consistent only with innocence as to his intent and purpose. They are: his authority to accept and process renewals for Southwestern Insurance Company up through March 24, 1977 and for Transamerica through May 15, 1977; his lack of personal knowledge of the erroneous receipt of premium payments on the Ragsdale and Taylor accounts; the billing system of these two companies, which permitted a lapse of two or three months between initial submission of a policy renewal and request for payment by the agency; the fact that an agent was justified, in the absence of notice from a company of refusal to renew or issue a policy, in assuming acceptance by the company and anticipating subsequent billing; acceptance of renewals from the Chaviers agency which were billed as late as May, 1977; aborted attempts of Chaviers to sell his agency between March, 1977 and June, 1977 and the transfer of files and records to prospective purchasers on two occasions; the absence of Chaviers from his agency office between Feb-

ruary, 1977, and July, 1977, except for one to two hours per day; inability of Chaviers to recover files and records after May 26, 1977; the chaotic and turbulent state of his business during the period in which most of the questioned premium payments were made; Mrs. Chaviers' description of appellant as being emotionally disturbed, distraught and subject to physical ailments during the period from February to August, 1977; the fact that 80 checks of policyholders for a total of approximately $6,000 were issued and 60 premium refunds totalling $10,000 were made up until August 9, 1977, when the agency account funds were exhausted; the failure of Ragsdale, Morgan, Bradley and Heaslip to communicate their complaints to appellant; the fact that Chaviers knew of only one charge at the time of his arrest in October, 1977, and the subsequent addition of the other counts one year after his arrest and 11 days before trial; appellant's candid acknowledgement that refunds were due prosecuting witnesses, even though he could only rely upon his agency records; the fact that agency records indicated that refunds had been made in the Weaver, Heaslip, Taylor and Davis accounts and that the Weaver, Heaslip and Taylor checks were never deposited to the agency account.

We do not agree with appellant that the evidence was only sufficient to arouse suspicion and the jury was left only to speculation and conjecture in arriving at its verdict, except as to Counts 7 and 8. We certainly disagree with appellant's statement that there was a failure of proof tending to show that appellant converted any insurance payments to his own use, in view of the fact that there was evidence that he paid expenses of his demolition business from the agency bank account, and that this account was depleted before refunds could be made in some instances.

Where circumstantial evidence does more than arouse suspicion, and is properly connected, and, viewing the evidence in the light most favorable to the state, the jury is not left to speculation and conjecture alone in arriving at its conclusion, it is basically a question for the jury to determine whether the evidence excludes every other reasonable hypothesis. *Upton* v. *State,* 257 Ark. 424, 516 S.W. 2d 904. This is such a case, and the jury's verdict is conclusive on this question.

We conclude, however, that the trial judge should have granted appellant's motion to set aside the verdict as to Counts 7 and 8. There is no evidence that either the Heaslip or Taylor checks ever went into the agency account. There was positive testimony that the Heaslip check had not. There was testimony that the Heaslip check had been voided and returned to Heaslip by letter, even though Heaslip denied having received it.

Mrs. Taylor felt sure that her check had been charged to her account but did not have any cancelled check or any record to support her statement. Chaviers testified that, had she produced her cancelled check, a refund would have been made. Mrs. Chaviers testified that she had noted on the copy of the receipt issued to Mrs. Taylor that the check in question had been returned. She had been unable to find any file on this account.

In June, July or August, 1977, Transamerica refunded the Heaslip payment without ever soliciting any explanation from Chaviers or his agency. The evidence that the Taylor check had been cashed was far from satisfactory. Appellant exhibited photographic copies of both the Heaslip and Taylor checks with the word "void" written thereon with his post-trial motion to set aside the verdict. He alleged that these copies of the checks had been found in the books and records of the agency in the state of Alabama, where they had been stored, and were received by him three days after the trial. We do not see how the jury could have done more than engage in speculation as to appellant's purpose in regard to these transactions if this evidence had been before it. For this reason, we feel that the trial court should have set aside the verdict of these two counts.

The motion to set aside the verdict must be viewed as a motion for a new trial. It incorporated an attack on the sufficiency of the evidence to support the verdict and newly discovered evidence. It might easily be said that there was no abuse of discretion in denial of this motion, were it not for the fact that the Heaslip and Taylor accounts were among eight counts added to the information in this case just 11 days prior to trial. The evidence that Chaviers was living at Boaz,

Alabama, and that his wife was working as a nurse there was undisputed. In the peculiar circumstances of this case, we find no lack of diligence and feel that the motion should have been granted as to these two counts. This means only that appellant is entitled to a new trial on these counts, because we cannot say that, without the new evidence as to the checks of Heaslip and Taylor, the evidence would have been insufficient to present a question for the jury. With that evidence before it, the jury could have only speculated as to two equally plausible conclusions as to Chaviers' purpose in these transactions, unless the state was able to rebut this new evidence.

Appellant contends that his sentence of 16 years' imprisonment and $8,000 in fines is so patently severe, when related to the facts and circumstances brought out at trial, that it should be regarded as cruel and unusual and constitutionally impermissible. Of course, that sentence may be reduced because of the reversals on two counts. Appellant contends that the punishment is cruel and unusual because it is so disproportionate to the nature of the offense as to shock the moral sense of the community.

Appellant's convictions on six counts of theft of property still stand. The jury found that six different people had lost property through theft by Chaviers. None of these offenses involved more than $2,500, but each involved more than $100. Thus, they were Class C felonies. Ark. Stat. Ann. § 41-2203 (2) (b) (i) (Repl. 1977). The minimum punishment on each offense was two years. Ark. Stat. Ann. § 41-901 (1) (c) (Repl. 1977). A fine of as much as $10,000 could have been imposed on each count. Ark. Stat. Ann. § 41-803 (3) (c) (Repl. 1977). An argument that the minimum prison sentence permissible under the applicable statute is cruel and unusual is rather strange. No punishment prescribed by statute is cruel and unusual unless it is barbarous, or unknown to the law, or so wholly disproportionate to the nature of the offense as to shock the moral sense of the community. *Carter* v. *State,* 255 Ark. 225, 500 S.W. 2d 368. We cannot say that the sentence in this case was cruel and unusual under this test.

The judgment is affirmed as to Counts 1, 2, 4, 5, 6 and 9.

As to Counts 7 and 8, the judgment is reversed and the cause remanded for a new trial.

We agree. GEORGE ROSE SMITH and HOLT and HICKMAN, JJ.