Bobby Joe MITCHELL *v.* STATE of Arkansas

CR 79-183                                       609 S.W. 2d 333
Supreme Court of Arkansas
Opinion delivered December 22, 1980

---

[1]This statute was in effect when Klimas committed the offese and remains the law today.

*James M. Barker, Jr.*, for appellant.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Chief Justice. Bobby Joe Mitchell was convicted of first degree murder in Ashley County, Arkansas, in March of 1969. That conviction was based on a plea of guilty and Mitchell was sentenced to life imprisonment. After Mitchell's conviction he served a sentence in the Wisconsin State Prison. During that time he inquired of the Ashley Circuit Court regarding an appeal. In 1975, when he was in the Arkansas penitentiary serving the sentence in this case, he filed a *pro se* petition for post-conviction relief. The circuit court denied the petition without an evidentiary hearing. In an unpublished opinion issued June 19, 1978, we reversed the trial court and ordered an evidentiary hearing on Mitchell's allegations that he had ineffective assistance of counsel and that his plea of guilty was not voluntary. A hearing was held in July, 1978. A record of the original proceedings of 1969 was not made a part of this record. The circuit court held that appellant was not entitled to relief from the plea of guilty entered by him on a charge of first degree murder, which, at that time might, at the discretion of a jury, be punished by imposition of the death penalty. There is no doubt that Mitchell entered his plea of guilty after consulting with his appointed counsel and upon advice from them. We will not reverse the findings of the trial judge unless they are clearly against the preponderance of the evidence.

Appellant has misdirected the focus of his argument for reversal of the circuit court's denial of relief from his plea of guilty. He directs his attention for the most part to the question of the voluntariness of a confession made by him, saying that it was coerced by the sheriff and his deputies and that he was deprived of his right to the assistance of counsel when he was making this statement and being interrogated.[1] The courts are not concerned with the question of deprivation of counsel during interrogation or the voluntariness of the statement Mitchell made. The only concern of the courts is whether counsel was so incompetent as to render the guilty plea involuntary and unintelligent. *Clark* v. *State*, 255 Ark. 13, 498 S.W. 2d 657.

---

[1] In connection with the latter argument he emphasizes the fact that counsel was selected by a deputy sheriff.

A guilty plea represents a break in the chain of events which has preceded it in the criminal process. In this connection, the United States Supreme Court, in *Tollett* v. *Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 46 L.Ed. 2d 235 (1973), said:

> \*\*\* And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, *McMann*, [*McMann* v. *Richardson*, 397 U.S. 759, 25 L.Ed. 2d 763, 90 S.Ct. 1441], it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings.

See also, *Clark* v. *State*, supra.

In *Brady* v. *United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L.Ed. 2d 747 (1970), *McMann* v. *Richardson*, 397 U.S. 759, 90 S. Ct. 1441, 25 L.Ed. 2d 763 (1970) and *Parker* v. *North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed. 2d 785 (1970), sometimes called the Brady trilogy, the United States Supreme Court refused to address the merits of claimed constitutional deprivations that occurred prior to a guilty plea, concluding in each case that the issue involved was not the merits of the constitutional claims as such, but rather whether the guilty plea had been entered intelligently and voluntarily with the advice of comptent counsel. *Tollet* v. *Henderson*, supra.

The very situation with which we are confronted was addressed by the United States Supreme Court in *McMann* v. *Richardson*, supra. That court stated the issue thus:

> The issue \*\*\* arises in those situations involving the counseled defendant who allegedly would put the State to its proof if there was a substantial enough chance of acquittal, who would do so except for a prior confession that might be offered against him, and who because of the confession decides to plead guilty to save himself the expense and agony of a trial and perhaps also to minimize the penalty that might be imposed.

After conviction on such a plea, is, a defendant entitled to a hearing, and to relief if his factual claims are accepted, when his petition for habeas corpus alleges that his confession was in fact coerced and that it motivated his plea? We think not if he alleges and proves no more than this.

The matter of the defendant who deems his confession crucial to the state's case against him but nevertheless enters a plea of guilty is treated extensively in McMann. The critical issues to be considered on application for post-conviction relief are clearly pointed out in the opinion in that case.

*** His [defendant's] later petition for collateral relief asserting that a *coerced* confession induced his plea is at most a claim that the admissibility of his confession was mistakenly assessed and that since he was erroneously advised, either under the then applicable law or under the law later announced, his plea was an unintelligent and voidable act. The Constitution, however, does not render pleas of guilty so vulnerable.

As we said in *Brady* v. *United States, ante,* at 756-757 the decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt? On those facts would evidence seized without a warrant be admissible? Would the trier of fact on those facts find a confession voluntary and admissible? Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney

will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing. Courts continue to have serious differences among themselves on the admissibility of evidence, both with respect to the proper standard by which the facts are to be judged and with respect to the application of that standard to particular facts. That this Court might hold a defendant's confession inadmissible in evidence, possibly by a divided vote, hardly justifies a conclusion that the defendant's attorney was incompetent or ineffective when he thought the admissibility of the confession sufficiently probable to advise a plea of guilty.

In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases. On the one hand, uncertainty is inherent in predicting court decisions; but on the other hand defendants facing felony charges are entitled to the effective assistance of competent counsel. Beyond this we think the matter, for the most part, should be left to the good sense and discretion of the trial courts with the admonition that if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts.

## IV

We hold, therefore, that a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without more, entitled to a hearing on his petition for habeas corpus. \*\*\*

\*\*\* As we have previously set out, a plea of guilty in a state court is not subject to collateral attack in a federal court on the ground that it was motivated by a coerced confession unless the defendant was incompetently advised by his attorney. \*\*\*

\*\*\* The defendant who pleads guilty is in a different posture. He is convicted on his counseled admission in open court that he committed the crime charged against him.

\*\*\* It is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.

It is clear from *McMann* that neither erroneous advice by counsel nor mistaken judgment is a basis for setting aside Mitchell's plea of guilty. The question is not whether, in retrospect, counsel's advice was right or wrong. The most that can be required is that the *advice* given was within the range of competence demanded of attorneys in criminal cases. It also seems from *McMann*, that, in order to be entitled to post-conviction relief, Mitchell must ". . . . demonstrate gross error on the part of counsel when he recommended that the defendant plead guilty instead of going to trial . . . .", or, otherwise stated, "allege and prove serious dereliction on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act."

Appellant had the burden of showing, in the trial court, that his counsel was incompetent which cannot be met by showing mere errors, omissions, mistakes, improvident strategy or bad tactics. *Leasure* v. *State*, 254 Ark. 961, 497 S.W. 2d 1. There is a presumption that the attorneys were competent, and the burden of overcoming that presumption was on appellant. *Davis* v. *State*, 267 Ark. 507, 592 S.W. 2d 118 (1980); *Deason* v. *State*, 263 Ark. 56, 562 S.W. 2d 79, cert. den. 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed. 2d 136 (1978). Where there has been a guilty plea after advice of counsel, the burden upon the accused seeking to set the plea aside is the same as in other cases, i.e., to show that the attorney has by his acts or omissions made the proceedings a farce or mockery or that the representation was so patently lacking in competency and adequacy that it is the court's duty to correct it. *Davis* v. *State*, supra; *Deason* v. *State*, supra.

Turning now to the record, as abstracted, we cannot say that the circuit judge's holding was against the preponderance of the evidence. Mitchell was arrested on March 2, 1969, the day the crime with which he was charged was committed. The attorney, Johnson, met with him at 7:00 p.m. on March 3, 1969. The confession was given at 8:00 or 8:30 p.m. on March 3, 1969. On March 6, Johnson was appointed by the court as counsel for Mitchell. Thomas Cashion, a more experienced lawyer, was appointed to assist in Mitchell's defense. On March 21, 1969, Mitchell was arraigned and entered his plea of guilty. A jury fixed the degree of the crime and set the punishment at life imprisonment, as then required by statute.

In his testimony at the post-conviction hearing, appellant testified that:

His counsel denied him the right to plead not guilty; his lawyer told him that if he did not plead guilty, he would be found guilty anyway and go to the electric chair. He asked for counsel when they first brought him to jail and they brought him one the same day. Johnson talked to Mitchell and was sitting beside him at a table while his confession was being taped, but the attorney got up and left in the middle of it, even though Mitchell had asked

him to remain present while Mitchell gave it. Counsel advised him that the best thing for him was to give a confession, whether it was right or wrong. The confession was given after he was beaten all night. He had been told that, if he did not give the confession, he would be electrocuted anyway because a white man was killed. He never told the court because his attorney told him not to talk to anybody but the attorney. He told Cashion about it in the courtroom. He asked Cashion to cross-examine a witness, but Cashion told him to shut up. He asked his attorney to let him testify, but the attorney said it would be best if he did not get on the stand. He did stand up in the courtroom when the judge read the charges and pleaded guilty. He did not say anything to the judge about the voluntariness of his confession held in the judge's chambers. The record of that hearing (which had been read to him while he was on the witness stand) spoke for itself.

Johnson testified that:

He talked to Mitchell on the evening of March 3. Mitchell did not say anything about having been beaten, or any coercion. Mitchell quite freely and openly, in a repentant sort of way told Johnson what had happened, saying that he was very sorry he had done it. Johnson advised Mitchell of his right to trial by jury, his right to plead not guilty and to have a court appointed attorney—either Johnson or someone else. After Johnson had advised Mitchell of his rights, Johnson opened the door and Mitchell told Furlow that he was ready to make a statement. Johnson left before the statement was completed because he did not consider himself Mitchell's attorney and only came to advise him of his rights. After he was appointed, Johnson went to talk to Mitchell and to Cashion, who had also been appointed. Johnson prepared a motion for a bill of particulars. The state made its entire file available to Johnson. From the evidence contained therein and from what Mitchell had told him, Johnson concluded that it would be in Mitchell's best interest to try to save his life. Mitchell

agreed, said he did not want to go to the electric chair and admitted having committed the crime. Mitchell was totally sane and never asked to be sent to the state hospital. all the attorneys hoped for was to get a jury to accept the prosecuting attorney's recommendation of a life sentence. At Mitchell's request, Johnson wrote a letter to a woman with whom Mitchell had been living, advising her that Mitchell had decided to plead guilty, and that the prosecuting attorney had agreed not to ask for the death penalty and expressing the opinion that, based upon the great amount of evidence the state had against Mitchell, he had made a wise decision, and that, if he pleaded not guilty a jury might sentence Mitchell to death in the electric chair. Mitchell did not, at any time, say that he desired to make any other plea. If he had desired to do so, a different plea would have been made.

Cashion testified:

He had practiced law since 1935 and had a lot of experience in criminal trials. He had been appointed counsel in at least eight cases which involved capital felonies and five of his clients did go to the electric chair. He was more experienced in this type of case than any other lawyer in and around southeast Arkansas. The first thing he did after being appointed was to call Johnson and a decision was made to seek a bill of particulars. When it was received, it contained the names of 22 witnesses. The sheriff showed the attorneys pictures that would be introduced at the trial. After he got the bill of particulars and the saw the sheriff's file, he thought the state had a good case and thought Mitchell's life was in jeopardy. The prosecuting attorney indicated that he would seek the death penalty. In discussions with Mitchell on two occasions, the attorneys went "over it all" and explained the alternatives. They explained the good and the bad. Mitchell made the final decision. The attorneys did not feel like gambling with his life. Mitchell never mentioned that anyone in the sheriff's department had beaten or mistreated him. Mitchell never complained, during the in camera proceeding,

that he had been mistreated. Cashion had all the testimony available and had gone over it.

Of course, all conflicts and credibility questions must be resolved against Mitchell on appellate review. *Thomas* v. *State*, 266 Ark. 162, 583 S.W. 2d 32; *Chaviers* v. *State*, 267 Ark. 6, 588 S.W. 2d 434 (1979).

The state's response to appellant's motion for a bill of particulars was comprehensive. It disclosed:

> Both Oliver Leach and Marvin Gaston would testify that Mitchell had asked him if he was interested in "pulling a job." Elgin Conley, would testify that at 5:00 a.m., on Sunday, March 2, he had seen the victim, Price, at the Esso Service Center in Crossett. He observed a black male he later identified as Mitchell at the concession stand there, wearing a cap, which he later identified, after it had been recovered from Mitchell's home. Houston Davidson would testify that he found the cap. Larry Stephenson would testify he found the body of Price, the victim, at about 5:45 a.m., went next door and called the police, and returned and stood guard over the body until the police arrived. John Lewis, a policeman, would testify as to pictures he had taken of the body and the bullet holes in it. Bill Jones, the coroner, would testify that he took two .22 caliber bullets from the body of Price and gave them to the police. Larry Stephens, Otis Henley and Teddy Hickman, police officers, searched the scene of the killing and found three spent .22 caliber empty shells and one shell near the body. Benny Pierce would testify that he was the owner of the service station and the employer of Price, that a sum of money was taken from a drawer, that two cartons of cigarettes were missing and that Price had been a faithful and honest employee for eight years. Kenneth Burnes, a policeman, found the money, apparently $72.15 in change, taken from the Esso station at Mitchell's home, wrapped in a bath towel, placed in a brown paper sack and stuffed under some diapers in a chest of drawers. John Lewis, a fireman for the city of Crossett, aiding the police in a search of the

Mitchell home, recovered the two cartons of cigarettes at the Mitchell home between the mattresses in Mitchell's bed. Officers Thomas, George and Webb found a .22 caliber rifle that had been stolen from Charles Posey two weeks prior to the shooting of Price, under the house of Artis Rollins, Mitchell's brother-in-law, who would testify that he crawled under the house and got the gun for the police, but knew nothing about the gun, the robbery, or the murder. Houston Davis found two .22 caliber shells which were the same type and brand as those used in the killing in the Mitchell home. Teddy Hickman and Otto Griffin took the rifle, shells and other bullets to State Police Headquarters for comparison. Captain Paul McDonald of the State Police would probably be the officer who would testify as to comparison of bullets found in the body with those fired from the rifle and the markings of the caps found near the body with those on two caps fired from the rifle.

Although petitioner alleged in his petition for post-conviction relief that his premises were entered and searched without a search warrant and without his consent, no evidence was introduced pertaining to that ground, and it was not otherwise mentioned. Nothing short of conjecture would justify any inference that the items of evidence were taken in a warrantless search of Mitchell's home.

Even if the confession in this case was involuntary, the period intervening between the time it was made and the plea of guilty entered upon advice of counsel, without any intervening coercion or improper state action, would normally be taken to make the connection between the confession and the plea of guilty so attenuated as to dissipate the taint of the "involuntary" confession. See *Parker* v. *North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed. 2d 785 (1970). In *Parker*, the Supreme Court of the United States held, as it did in *McMann*, that counsel's mistake as to the admissibility of a confession in advising a defendant to plead guilty when faced with a possible death penalty under a statute later held unconstitutional, was not a basis for setting aside the plea of guilty, in spite of the fact that chances of acquittal without the confession might be good and the advice to plead guilty

based upon the fact that, given the confession, the evidence was so strong that it was to his advantage to plead guilty. If the plea of Mitchell was knowingly and voluntarily entered, it is not open to attack on the ground that counsel misjudged the admissibility of his confession.

The fact that appellant was motivated by a fear of the imposition of the death penalty, even when the statute providing for it was later held unconstitutional, is not sufficient basis for setting aside a plea of guilty upon advice of competent counsel which was otherwise voluntarily and knowingly entered. *Brady* v. *United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed. 2d 747 (1970). See also, *Jones* v. *State*, 267 Ark. 79, 589 S.W. 2d 16 (1979). Actually, it seems from Brady that fear of the death penalty is a perfectly valid basis for a voluntary and intelligent plea of guilty, regardless whether the plea results from the certainty or the probability of a lesser penalty. See also, *Parker* v. *North Carolina*, supra. In *Brady*, the court used this pertinent language:

> *** For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.

The court in *Brady* also pointed out that well over three-fourths of the criminal convictions in this country rest on pleas of guilty, and that, undoubtedly, a great many of them were motivated, at least in part, by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to a judge or jury.

We cannot say that the trial court's finding that Mitchell's appointed counsel were effective and that the allegations in the motion for post-conviction relief had failed was against the preponderance of the evidence.

The judgment is affirmed.